IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NEIL GILMOUR, III, TRUSTEE FOR THE GRANTOR TRUSTS OF VICTORY PARENT COMPANY, LLC, VICTORY MEDICAL CENTER CRAIG RANCH, LP, VICTORY MEDICAL CENTER LANDMARK, LP, VICTORY MEDICAL CENTER MID-CITIES, LP, VICTORY MEDICAL CENTER PLANO, LP, VICTORY MEDICAL CENTER SOUTHCROSS, LP, VICTORY SURGICAL HOSPITAL EAST HOUSTON, LP, AND VICTORY MEDICAL CENTER BEAUMONT, LP , | § § § § § § § § § § § § | |
| *Plaintiffs*, | § § | JURY DEMANDED |
| VS. | § § | CIVIL ACTION NO.: 5:17-cv-00510 |
| AETNA HEALTH, INC., AETNA HEALTH INSURANCE COMPANY, AND AETNA LIFE INSURANCE COMPANY, | § § § § § § | |
| *Defendants*. | § § | |

## PLAINTIFFS' COMPLAINT

Neil Gilmour, III, solely in his capacity as Trustee for the Grantor Trusts of Victory Parent Company, LLC; Victory Medical Center Beaumont, LP; Victory Medical Center Craig Ranch, LP; Victory Medical Center Landmark, LP; Victory Medical Center Mid-Cities, LP; Victory Medical Center Plano, LP; Victory Medical Center Southcross, LP; Victory Surgical Hospital East Houston, LP (collectively, "Victory") file this Complaint ("Complaint") against Defendants Aetna Health, Inc., Aetna Health Insurance Company, and Aetna Life Insurance Company (collectively, "Aetna"), and would respectfully show the Court as follows:

**PLAINTIFFS' COMPLAINT – PAGE 1**

## I.  INTRODUCTION

1.       Plaintiffs are a group of medical centers and hospitals that provided medical procedures, including complicated, high-cost orthopedic surgeries, to thousands of Aetna's plan members.   Plaintiffs were not, for the period of time at issue in this litigation, a participating provider in Aetna's network (though they later became participating providers), and are therefore considered non-participating or out-of-network providers for purposes of this litigation. Although Plaintiffs provided stellar care, Aetna delayed processing, then incorrectly denied or underpaid many of the Plaintiffs' claims and, at one point, accused Plaintiffs of engaging in "highly suspicious billing patterns" without any substantiating evidence.   As a result of that accusation, Aetna placed a flag on every single one of Plaintiffs' tax ID numbers,[1] which resulted in Plaintiffs' claims being handled, not by Aetna's claims department in the ordinary course, but by its Special Investigative Unit ("SIU").   The SIU frequently requested medical records prior to adjudicating the Plaintiffs' claims and failed to adjudicate the Plaintiffs' claims in the statutory timeframe.   On some occasions, Aetna simply denied the claims; on others Aetna underpaid the claims, after a lengthy delay, by failing to pay the claims at the rate provided for in the patient's health benefit plan, or at the rates it promised to Plaintiffs when the Plaintiffs' representatives verified the patient's benefits pre-surgery.

2.       Aetna failed to appropriately reimburse Plaintiffs under the terms of the patients' plans, including allowing no reimbursement whatsoever for 46 undisputed medically-appropriate procedures that were covered under the patients' benefit plans for which Plaintiffs billed approximately $1.6 million.   Aetna also underpaid 2,943 medically-appropriate claims, as explained further in this Complaint.   Indeed, for a number of these underpaid claims, Aetna did not even allow enough to cover the cost of the implants that Victory provided to the patient

---

[1]       Each hospital or facility had its own TIN.

(much less Victory's other expenses).[2]  Plaintiffs seek as damages the amounts that they should have been paid for those surgeries under either ERISA, for patients whose plans are governed by ERISA, or under Texas common law for breach of contract for the patients whose benefit plans are not governed by ERISA.

3.      Additionally, in some instances, Aetna misrepresented the terms of the patient's plan to the Plaintiffs when the Plaintiffs' intake employees called in advance of the patient's surgery to verify the patient's benefits.  For those claims, Plaintiffs seek to recover as damages under Texas law the payment level that Aetna promised to pay.

4.      But this case is about more than failing to pay under the terms of the operative plans.  This is also a case about Aetna's drive to put out-of-network providers out of business unless they accept contractual terms and join Aetna's provider network.  Aetna used delay, no-payments, and under-payments to apply this pressure; it also made it nearly impossible for the Plaintiffs to know if they were being properly paid by refusing to provide the plan language that is the basis for payment of each claim.  Only through the bankruptcy process have Plaintiffs been able to begin to discover the extent to which Aetna has failed to pay according to its obligations under the patient plans.  Thus, Plaintiffs also seek recovery for ERISA penalties for Aetna's failure to timely release plans and plan language upon Plaintiffs' requests.  Moreover, in cases where Aetna misled the Plaintiffs about the level of benefits, Plaintiffs seek exemplary damages.

5.      Even when it did pay, Aetna's unjustified placement of "flags" on Plaintiffs' tax ID numbers, unjustified request for medical records, and other claims processing practices that

---

[2]      A list of the claims that Plaintiffs contend were not paid correctly and are at issue in this litigation will be provided to Aetna on an encrypted CD when summons is served (or when Aetna agrees to waive service of summons) in order to protect the confidential patient information at issue.  That list of claims is incorporated herein by reference under Federal Rule of Civil Procedure 10.  The Trustee's investigation into Aetna's conduct and claims handling is ongoing, and Plaintiffs reserve the right to add additional healthcare claims as they are discovered.

resulted from processing Plaintiffs' claims through Aetna's SIU constantly frustrated Plaintiffs' ability to run their business by starving them of necessary cash flow.  Sitting on claims for months longer than it is permitted to, providing misleading claims denial information, and generally stalling proper resolution of outstanding issues harmed Plaintiffs.  This was all done in service to Aetna's ultimate goal: force Plaintiffs to agree to in-network contracts, or force them out of business.  Through Aetna's actions, Plaintiffs were denied tens of millions of dollars of cash flow which was desperately needed for the hospitals to operate and pay creditors.  In the end, this proved to be cash flow the withholding of which drove Plaintiffs into bankruptcy.

## II.  PARTIES

6.      Plaintiff Victory Medical Center Beaumont, LP ("Victory Beaumont") is a Texas limited partnership that formerly operated a hospital located at 6025 Metropolitan Drive, in Beaumont, Jefferson County, Texas 77706, where Victory Beaumont was headquartered. Victory Beaumont was a privately-owned entity that provided specialized-surgical-hospital services to patients in the Beaumont market.

7.      Plaintiff Victory Medical Center Craig Ranch, LP ("Victory Craig Ranch") was a Texas limited partnership that formerly operated a hospital located at 6045 Alma Road, Suites 100 and 200, in McKinney, Collin County, Texas 75070, where Victory Craig Ranch was headquartered.  Victory Craig Ranch was a privately-owned entity that provided specialized-surgical-hospital services to patients in the Dallas-McKinney market.  Victory Craig Ranch filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 12, 2015, Case Number 15- 42379 in the Northern District of Texas, Fort Worth Division.

8.      Plaintiff Victory Medical Center Landmark, LP ("Victory Landmark") was a Texas limited partnership that formerly operated a hospital located at 5330 N. Loop 1604W, in San Antonio, Bexar County, Texas 78249, where Victory Landmark was headquartered.  Victory

Landmark was a privately-owned entity that provided specialized-surgical-hospital services to patients in the San Antonio market.  Victory Landmark filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 12, 2015, Case Number 15-42382 in the Northern District of Texas, Fort Worth Division.

9.      Plaintiff Victory Medical Center Mid-Cities, LP ("Victory Mid-Cities") was a Texas limited partnership that formerly operated a hospital located at 1612 Hurst Tower Center Drive, in Hurst, Tarrant County, Texas 76054, where Victory Mid-Cities was headquartered. Victory Mid-Cities was a privately-owned entity that provided specialized-surgical-hospital services to patients in the Dallas-Fort Worth market.  Victory Mid-Cities filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 12, 2015, Case Number 15-42373 in the Northern District of Texas, Fort Worth Division.

10.     Plaintiff Victory Medical Center Plano, LP ("Victory Plano") was a Texas limited partnership that formerly operated a hospital located at 2301 Marsh Lane, in Plano, Collin County, Texas 75093, where Victory Plano was headquartered.  Victory Plano was a privately-owned entity that provided specialized-surgical-hospital services to patients in the Dallas-Plano market.  Victory Plano filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 12, 2015, Case Number 15-42377 in the Northern District of Texas, Fort Worth Division.

11.     Plaintiff Victory Medical Center Southcross, LP ("Victory Southcross"), formerly known as Innova Hospital San Antonio, LP, was a Texas limited partnership that formerly operated a hospital located at 4243 E. Southcross Blvd., San Antonio, Texas 78222, where Victory Southcross was headquartered.  Victory Southcross was a privately-owned entity that provided specialized-surgical-hospital services to patients in the San Antonio market.  Victory

Southcross filed a petition for relief under Chapter 11 of the Bankruptcy Code on July 10, 2015, Case Number 15-42818 in the Northern District of Texas, Fort Worth Division.

12.     Plaintiff Victory Surgical Hospital East Houston, LP ("Victory East Houston") is a Texas limited partnership that formerly operated a hospital located at 12950 East Freeway, Suite 100, in Houston, Harris County, Texas 77015, where Victory East Houston was headquartered.  Victory East Houston was a privately-owned entity that provided specialized-surgical-hospital services to patients in the Houston market.

13.     Plaintiff Victory Parent Company, LLC ("VPC") is a Texas limited liability company. VPC is the sole member of Victory Medical Beaumont GP, LLC, the general partner of Victory Beaumont.  VPC is also the sole member of Victory Surgical Hospital East Houston GP, LLC, Victory East Houston's general partner.  VPC was headquartered in the city of The Woodlands, Montgomery County, Texas. VPC filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 12, 2015, Case Number 15-12384 in the Northern District of Texas, Fort Worth Division.

14.     Plaintiff Neil Gilmour is the trustee for the Grantor Trusts for Victory Medical Center Craig Ranch, LP; Victory Medical Center Landmark, LP; Victory Medical Center Mid-Cities, LP; Victory Medical Center Plano, LP; Victory Medical Center Southcross, LP; and Victory Parent Company, LLC.  Gilmour was appointed trustee pursuant to the First Amended Plan of Reorganization (the "Plan") confirmed on March 28, 2016, in Case No. 15-42373 in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. Pursuant to the Plan, all of the debtors' claims and causes of action against the defendant have vested in the Grantor Trusts.

**PLAINTIFFS' COMPLAINT – PAGE 6**

15.     References in this Complaint to "Victory" include collectively, Victory Craig Ranch, Victory Landmark, Victory Mid-Cities, Victory Plano, Victory Southcross, Victory Beaumont, Victory East Houston, and VPC.  References in this Complaint to "Plaintiffs" include collectively Victory Beaumont and Victory East Houston, and Neil Gilmour as the Trustee for the Grantor Trusts for Victory Craig Ranch, Victory Landmark, Victory Mid-Cities, Victory Plano, Victory Southcross, and VPC.

16.     Defendant Aetna Health, Inc. is a Texas corporation with its principal place of business in Texas, doing business in the State of Texas.  Aetna Health, Inc. administers and/or underwrites health benefit plans and/or health insurance policies covering Texas residents, including Victory patients.   Aetna Health, Inc. may be served with summons through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

17.     Aetna Health Insurance Company is a Pennsylvania corporation doing business in the State of Texas.  Aetna Health Insurance Company administers and/or underwrites health benefit plans and/or health insurance policies covering Texas residents, including Victory patients.  Aetna Health Insurance Co. may be served with summons through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

18.     Defendant Aetna Life Insurance Company is a Connecticut corporation doing business in the State of Texas.  Aetna Life Insurance Company administers health benefit plans covering Texas residents, including Victory patients.  Aetna Life Insurance Company may be served with summons through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

19.     References in this Complaint to "Aetna" include, collectively, Aetna Health, Inc.,

Aetna Health Insurance Company, and Aetna Life Insurance Company.

### III.  JURISDICTION AND VENUE

20.     This Court has personal jurisdiction over Aetna because it conducts substantial

business in Texas and a substantial part of the events or omissions giving rise to Plaintiffs'

claims occurred here.

21.     The Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §§

1001 et seq., the Employment Retirement Income Security Act ("ERISA"), as Plaintiffs' claims

arise in part under ERISA.  To the extent that Plaintiffs bring claims that do not arise out of

ERISA, the Court has pendent matter jurisdiction.

22.     Venue is proper in the Western District of Texas pursuant to 29 U.S.C.

§ 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims

occurred in this judicial district.

### IV.  BACKGROUND AND FACTS

**A.     The Victory Hospitals' Verification, Claims Filing, and Appeals Processes**

23.     Victory operated a series of hospitals and other medical facilities in Texas.

Victory's hospitals were high quality surgical hospitals that specialized in orthopedic surgeries,

including spinal surgery.  Victory brings this action pursuant to healthcare plans directly insured

and/or administered by Aetna.

24.     The plans at issue permit insureds to obtain healthcare services from facilities

such as those run by Victory that have not entered into contracts with Aetna (referred to as "out-

of-network," "non-participating" or "non-par" providers).  Aetna is required under the terms of

its member health benefit plans or insurance contracts ("Plans") and the federal law governing

certain of those plans to promptly pay out-of-network benefits based on the Aetna Plan governing the member's procedure.

25.     Generally, a patient's healthcare benefit plan is governed by the applicable provisions of ERISA, 29 U.S.C. § 1001 *et seq*.  The patient's ERISA health plan is interpreted by the plan administrator, which is the employer, and not by a third party administrator such as Aetna, unless such authority has been delegated or assigned to Aetna by the Plan Sponsor.  The applicable plan governs how much the employee pays, and gives the employee member certain benefits, which include the right to go to a doctor or facility of the member's choice to treat illness, and to obtain reimbursement for that treatment from Aetna.

26.     There are two types of plans at issue in this case: (1) self-funded plans which Aetna administers, and (2) fully-funded plans which Aetna insures.  When Aetna insures a plan directly, as well as when it exercises discretionary authority or control of self-insured plans, Aetna is an ERISA fiduciary.  Aetna therefore owes fiduciary duties to all members and subscribers in its ERISA plans and to Victory's facilities, since these are now beneficiaries and assignees under the assignments of benefits executed by Aetna's insureds who received services at those facilities.  In other words, under the assignments, the Victory facilities step into the shoes of the insureds and become plan beneficiaries for the claims at issue in this case.

27.     As noted above, the Victory facilities were, with respect to the claims at issue, out-of-network providers with respect to Aetna and its benefit plans.  Generally, for non-emergent services, Aetna is required to pay claims submitted by an out-of-network provider according to a payment methodology set forth in the patient's benefit plan[3].  The benefit plans that Aetna administers generally employ two out-of-network payment methodologies: (1) the

---

[3]     Excepting situations in which Aetna has represented a different, higher-reimbursing payment methodology to the hospital when it verified the patient's benefits, entitling Victory to payment at the represented rate.

**PLAINTIFFS' COMPLAINT – PAGE 9**

"Reasonable and Customary" rate (sometimes called the usual and customary rate, or the prevailing rate) in that particular geographic area; or (2) a specified percentage of the Medicare Allowable amount.  In some instances, the benefit plan did not specify a payment methodology, other than to employ the maximum amount determined by Aetna to be payable for a particular claim.

28.     Despite the fact that the Victory facilities were assignees of the patients' benefits and entitled to receive copies of the benefit plans to verify Aetna's application of the correct payment methodology, Aetna frequently refused to provide benefit plans to Victory if Victory requested them as part of the claims adjudication or appeals process.  Indeed, for claims where Aetna paid an allowable that it determined in its sole discretion, Aetna refused to provide the fee schedule it used to calculate that allowable, despite the clear relevance of such a document to the Victory hospitals' claims.  As explained below, Plaintiffs were not able to obtain any of the benefit plans at issue until years after the claims at issue were submitted as part of discovery done during the Victory facilities' bankruptcies.

29.     Victory's facilities had standard practices in dealing with Aetna (and other insurers) before admitting a patient for non-emergent surgery or admissions.  Victory would contact Aetna by telephone to verify the patient's benefits, that the patient had insurance, that the insurance plan at issue provided for out-of-network benefits, and what the patient's deductible, out-of-pocket maximums, and coinsurance were.  Victory or the patient's physician's office also regularly obtained any necessary authorizations; indeed, most of the surgeries that Victory performed for Aetna members were preauthorized by Aetna.  Victory would also ask how Aetna determined the allowable amount for the procedure(s) at issue, i.e., the dollar amount to which terms such as deductibles, out-of-pocket maximums, and coinsurance were supposed to be

**PLAINTIFFS' COMPLAINT – PAGE 10**

applied to determine how much Aetna would pay for the surgery and admission.  Sometimes Aetna would just say "the allowed amount" (essentially giving no information at all).  Other times, the Aetna representative would specify the methodology Aetna would apply to determine the allowed amount (e.g., the charge that is reasonable and customary in the geographic region, 140% of what Medicare would allow for the same procedures, etc…).  For many of the claims, the Aetna representative stated at the verification stage that Aetna would price the claim using the usual-and-customary rate.

30.     For example, Victory Plano patient B.T. (Account No. 204273) was scheduled to undergo a combined anterior and posterior spinal fusion on September 19, 2013; Aetna pre-authorized the surgery and her inpatient admission (Authorization No. 74369587).  On September 17, 2013, the hospital called Aetna to verify B.T.'s benefits.  Aetna informed the hospital's representative that the patient's plan provided for payment at the reasonable and customary rate.  B.T.'s surgery was successful, and she was discharged on September 21, 2013.  The total charge for B.T.'s surgery was $338,853.36.  The hospital then submitted its claim to Aetna on October 11, 2013; after numerous delays, Aetna finally allowed only $81,613.96 on the claim, and paid the hospital $48,968.38 on May 8, 2014 (the difference between the allowed amount and the amount paid is the patient's copayment, coinsurance, and deductible).  The hospital submitted a corrected claim, adding requests for reimbursement of certain additional services, almost immediately after receiving Aetna's adjudication; Aetna delayed and then did not adjudicate the corrected claim until more than six months later, in December 2014, and when it did it allowed no additional payment.  The hospital then submitted a reconsideration request and an appeal arguing that Aetna had not paid it the reasonable and customary rate quoted at the benefits verification stage; Aetna upheld its payment determination in response to both.  Despite

**PLAINTIFFS' COMPLAINT – PAGE 11**

quoting B.T.'s benefits at the reasonable and customary rate, Aetna instead appears to have decided to apply 140% of the Medicare allowable to determine the allowable for this claim.

31.     Victory's facilities would also obtain from each patient an assignment of benefits which gives Victory the ability to collect the reimbursement owed to the patients under the Aetna plans and, if necessary, to appeal an adverse benefits determination or to file suit against Aetna to collect amounts owed.   For each claim that Victory brings forth in this action it has an assignment of benefits from the patient, who in each case is an insured under an Aetna-administered benefit plan.[4]

32.     After the patient's surgery, Victory's facilities would send a claim to Aetna. Under the Plans, Aetna is supposed to determine an allowed amount for the services provided, apply the various terms of the patient plan, such as deductible, coinsurance, copayment, and out-of-pocket maximum, and thereby come up with a reimbursement under the applicable patient plan.  Aetna makes this determination in the normal course of its business.

33.     After a Victory hospital submitted a claim to Aetna, Aetna routinely delayed processing that claim, then further delayed making any payment that was due.  Aetna frequently responded to Victory's submission of a claim by requesting either the patient's medical records, an itemized bill, invoices reflecting the cost of the implants used, or some other piece of information (such as coordination-of-benefits information regarding another insurer's potential

---

[4]     Victory anticipates that Aetna will argue that it was not required to reimburse Victory for at least some of the claims at issue because some of Aetna's Plans contain anti-assignment clauses.  Such clauses, however, are unenforceable under both Texas law and ERISA regulations.  Tex. Ins. Code § 1204.053(a) ("An insurer may not deliver, renew, or issue for delivery in this state a health insurance policy that prohibits or restricts a covered person from making a written assignment of benefits to a physician or other health care provider who provides health care services to the person"); 29 C.F.R. §.2560.503-1(a)(4) (requiring claims procedures that do not, among other things, "preclude an authorized representative of a [patient] from acting on behalf of [the patient] in pursuing a benefit claim").  Moreover, to the extent not void, Aetna has waived the right to rely on any such anti-assignment clauses by making payment on claims directly to the Victory hospitals.

liability for the services Victory provided).[5]   These requests were so frequent that by 2013, Victory was submitting all claim forms on paper (rather than electronically) and enclosing the itemized bill, medical records, and implant invoices with the claim form.   No matter; Aetna continued to request these documents, despite the fact they had already been provided by Victory to Aetna prior to adjudicating the Victory hospital's claim.[6]

34.   Victory employed collectors who diligently followed up on claims that it submitted to Aetna.   These collectors regularly called on claims that had been outstanding without any adjudication for more than thirty days which, for Aetna, was most claims.   When these collectors called on overdue claims, Aetna representatives were often unable to provide any information regarding the claim, other than that it was being processed.   Sometimes these delays lasted for months before a claim was finally adjudicated.

35.   For example, the delays Victory Plano suffered on the B.T. claim exemplify the extreme delay that Aetna employed when adjudicating the Victory hospitals' claims.   As described above, see ¶ 30, Victory Plano first submitted a claim to Aetna for the services it provided to B.T. on October 11, 2013.   On November 21, 2013, Aetna requested B.T.'s medical records; the hospital faxed the records to Aetna on November 25.   On January 15, 2014, the hospital called Aetna regarding the claim status; Aetna's representative stated that the medical records were received and that the claim was undergoing medical review.   On January 30, 2014, the hospital called Aetna again and was told the claim was still in review.   On February 25, 2014, the hospital called Aetna again; this time, it was told the claim was undergoing SIU review, and that could take an additional 30 to 90 days.   Finally, on May 8, 2014 (209 days after the hospital

_____

[5]      An itemized bill specifies each charge made for that patient's admission.

[6]      ERISA regulations generally require a plan administrator to adjudicate a claim within 30 days of its submission, with one 15-day extension permitted to request additional information.   29 C.F.R. § 2560.503-1(f)(iii)(B).   Aetna often exceeded these deadlines when handling Victory's claims.

submitted its claim, and 164 days after Aetna received the patient's medical records), Aetna completed its adjudication of the claim.

36.     The Hospital then submitted a corrected claim on June 19, 2014 to include some inadvertently omitted charges.  On October 28, 2014, the hospital contacted Aetna to request the status on the corrected claim; in response, Aetna requested an itemized bill which the hospital faxed to it that same day.  On November 14, 2014, the hospital called Aetna again, and was told that the claim had been forwarded to the processors and no other information was available. Finally, on December 30, 2014, Aetna adjudicated the corrected claim and determined that no additional payment was due.  Aetna spent a total of 403 days adjudicating the original claim and corrected claim.

37.     Another example is Victory's claim for Victory Plano patient M.W., who was admitted on June 17, 2013 for a combined anterior/posterior spinal fusion, and was discharged June 21, 2013.  The hospital submitted a claim to Aetna on July 2, 2013, with total charges of $350,736.48.   Aetna requested medical records on August 23, 2013; the hospital faxed the medical records to Aetna on September 6.  The hospital then called Aetna on November 22, 2013 to ask about the status of the claim; according to the Aetna representative, the medical records were received on September 6, but were not forwarded for review until October 31.  The hospital called Aetna again on December 17, 2013 and was told that medical review was complete, that the claim had been forwarded for processing on December 3, and that processing would be completed within fifteen days.  The hospital next called Aetna on January 14, 2014, and was told the claim was denied because Aetna had not received the requested medical records.   The hospital representative explained that the records had been sent and Aetna had confirmed receipt of the records, and the Aetna representative then stated that the claim was actually still in review.

**PLAINTIFFS' COMPLAINT – PAGE 14**

The hospital's representatives spoke with Aetna at least ten more times (on January 22, February 20, April 1, April 9, April 17, May 12, May 14, May 22, June 16, and June 24) and submitted additional records (some of which had already been submitted once) before Aetna finally processed the claim on July 7, 2014, more than a year after the hospital submitted the claim. Then, despite the fact that the patient's benefit plan provided that out-of-network claims would be paid at the reasonable and customary rate, Aetna allowed only 20% of the hospital's charges. The hospital submitted an appeal, but Aetna upheld its adjudication of the claim.

38.    These types of delay were not atypical for Victory's claims.

39.    These delays appear to have been related, at least in part, to Aetna's decision to place the Victory facilities under the supervision of its "Special Investigations Unit" ("SIU"). Aetna and other insurers use SIUs to investigate potential fraud and abuse by providers; however, here Aetna had no basis to believe that Victory was doing anything fraudulent or abusive.  Nevertheless, Aetna placed at least some of the Victory facilities under the supervision of its SIU as early as June 2011, and potentially earlier.  (An Aetna representative informed a Victory representative in June 2011 when she was calling on a claim that involved implants that had cost Victory over $200,000 and that Aetna reimbursed at only $28,800 that Victory's claims were being adjudicated by Aetna's SIU.)  Aetna's SIU's supervision of Victory's claims was unwarranted and resulted in, at a minimum, substantial delays in the processing of Victory facilities' claims.[7]

---

[7]    Another impact of Aetna's SIU was to cancel agreements reached with Victory to pay certain claims at certain rates.  Victory sometimes negotiated "single-case agreements" with Aetna Global Claim Services, under which Aetna agreed to pay a certain rate for a particular claim, and Victory agreed to accept that payment as payment in full, and to not balance-bill the patient.  Victory representatives were informed in late 2013 that Aetna's SIU even went so far as to cancel some of these agreements once a claim was submitted.

**PLAINTIFFS' COMPLAINT – PAGE 15**

40.     After receiving the results of Aetna's adjudication of its claims, Victory generally followed Aetna's procedures for appealing claim denials and underpayments.  Victory both called Aetna on claims and asked that they be sent back for reconsideration (which satisfies Aetna's appeals process) and filed appeals in writing.  Aetna routinely upheld its initial adjudication in response to those appeals.  Aetna rarely, if ever, changed a payment determination based on Victory's appeals.

41.     In conducting claims processing, Aetna often provided false, misleading, or incomplete information regarding the status of the Victory hospital's claim and Aetna's appeals process.  For example, Victory's collectors would call on a claim for months and be told that it was still in processing, only to later learn that Aetna had adjudicated the claim months before and the hospital's appeal deadline, according to Aetna, had expired.  Other times, the hospital would request that a claim be sent to appeals, and Aetna would refuse, instead stating that the claim had to be reconsidered first.  In other instances, Aetna would receive appeals from Victory and never respond; indeed, if an appeal was submitted or a claim was rebilled too close to Aetna's adjudication date, Aetna would lose track of the appeal.

42.     Another common Aetna tactic was to refuse to provide the applicable plans or plan language to the hospitals, even though the Victory hospitals, as the patients' assignees, were entitled to receive that information.  Aetna would also on occasion fail to provide the Victory hospitals with information that was essential to their ability to appeal, such as what payment methodology Aetna had employed when it priced the claim, or why a particular charge was denied.  These tactics at times prevented Victory from complying with Aetna's appeals procedures or effectively appealing Aetna's adjudication at times.

43.     Due to Aetna's failure to address Victory's valid appeals in any meaningful way, Victory did not appeal every claim upon which this action is based to completion.  Failure to do so, however, is excused because any further appeal of these claims would have been futile given the results from the appeals of the vast majority of the claims at issue in this case and Aetna's hostility to Victory.  Indeed, Aetna set up its systems so that the Victory hospitals' claims would be automatically routed to its SIU for adjudication, even though it had no basis to justify SIU supervision of claims.  In short, Aetna's own actions made further appeals futile.[8]

**B.     Aetna's Incorrect Adjudication of Victory's Claims**

44.     Since shortly after the Victory hospitals' inception, Aetna has underpaid certain claims the Victory hospitals have submitted for surgeries performed for Aetna plan members.  It did so through two primary ways: (1) by paying Victory 140% of the Medicare allowable[9] on nearly every claim that Victory submitted, regardless of the terms of the patients' Plans; and (2) failing to correctly calculate the Medicare allowable.  In this way, Aetna hit the Victory facilities with a double whammy: it applied the wrong (lower) payment methodology to their claims, and then incorrectly calculated the base rate for that (lower) payment methodology.

45.     This is consistent with Aetna's nationwide strategy with respect to out-of-network providers to delay payment and ultimately underpay claims submitted by out-of-network

---

[8]     Additionally, ERISA regulations provide that a claimant is deemed to have exhausted all administrative remedies when the benefit plan fails to follow the required claims processing procedures. 29 C.F.R. § 2560.103-1(l).   Thus, the Victory hospitals should be deemed to have exhausted all administrative remedies on all ERISA claims that Aetna failed to pay within the deadlines set forth in note 5, *supra*.

[9]     The Medicare allowable is the amount that Medicare would have paid on that particular claim. For inpatient claims, the Medicare allowable is calculated under the Inpatient Prospective Payment System using the MS-DRG methodology, which assigns weights and base payment rates to specific MS-DRG codes based on the severity of the patient's condition.   For outpatient claims, the Medicare allowable is calculated using the Outpatient Prospective Payment System and the APC classification, which is similar.

providers.  The end goal of Aetna's strategy is to force out-of-network providers like the Victory facilities to either (1) agree to in-network contracts, or (2) force these facilities out of business.

46.     This goal is made clear by certain of Aetna's conduct towards Victory; for instance, when Victory representatives called Aetna on claims after Aetna had adjudicated the claim, those representatives nearly always asked Aetna what methodology it had used to pay the claim.  For the claims at issue in this litigation, the answer was often that Aetna had paid at 140% of the Medicare allowable.  This was true even when the patients' Plans (or Texas or federal law) provided that out-of-network providers were to be paid using a different methodology, such as the usual and customary rate.  In essence, Aetna contends that 140% of the Medicare allowable was the reasonable and customary rate for that geographic area (and its representatives told that to Victory personnel various times when Victory called on underpaid claims).

47.     The truth is that the Medicare allowable (and any arbitrary percentage thereof) bears no relation to the usual and customary rate (or the prevailing charge) in any geographic area.  Instead, the Medicare allowable is based upon a provider's reported costs to Medicare.  The Medicare allowable was never intended to substitute for the usual and customary rate (or prevailing charge) in a geographic area.

48.     Additionally, Aetna frequently miscalculated the Medicare allowable for many of the claims at issue.  The Center for Medicare and Medicaid Services, the federal agency responsible for administering the Medicare program, provides a "pricer" tool that can be downloaded from its website and used to determine the approximate Medicare allowable for a claim.  Victory collectors frequently used this pricer tool to check the Medicare allowable that

Aetna had used to price its claims, and they often found that Aetna had not correctly calculated the Medicare allowable (and was often off by a substantial amount).[10]

49.     In addition to these two issues, Aetna also incorrectly adjudicated many of the Victory facilities' claims by unbundling and re-bundling the hospitals' charges for implants into its charges for the surgery where those implants were used.  This is contrary to coding principles and differs from how Aetna adjudicates in-network providers' claims, where Aetna generally allows an additional amount to cover the cost of high-cost implants that are provided to its members.  (Indeed, when the Victory hospitals joined Aetna's network in October 2014, the participating provider agreement(s) with Aetna included an implant carve-out that made additional payment to the hospitals for using implants.)  This practice resulted in Aetna paying the Victory hospitals far less on claims for orthopedic and other surgeries that utilized expensive implants than if the implants were reimbursed separately, as Aetna does for in-network providers and as is the usual practice in the industry.

50.     For example, Victory Southcross patient J.H. (account no. 5005324) underwent an anterior lumbar interbody fusion on June 1, 2011.  The hospital verified J.H.'s benefits prior to her admission, but Aetna refused to provide any information about the payment methodology Aetna would employ to pay the claim.  The hospital's total charges for J.H.'s surgery and inpatient admission were $989,985.94; the implants used in the surgery alone cost the hospital $178,257.  Aetna then allowed and paid only $28,800; when the hospital inquired the reason for the low payment, Aetna's representative stated that the patient's plan only allowed $2,400 per

---

[10]     Aetna has confirmed that, at least for some claims, it did not correctly determine the Medicare allowable when it adjudicated that claim.  For example, in the fall of 2016, Aetna reprocessed three high-dollar claims that were, by that point, several years old, to pay additional amounts to bring its total payment of these claims up to 140% of the Medicare allowable.  Importantly, the Victory facilities had appealed each of these claims years ago, and pointed out Aetna's incorrect calculation of the Medicare allowable to it, but Aetna had done nothing.  Plaintiffs do not admit that these claims are correctly paid now.

**PLAINTIFFS' COMPLAINT – PAGE 19**

day per diem for spinal surgery based on a fee schedule. When the hospital asked to see the fee schedule, Aetna refused to provide it. The hospital appealed, requesting that, at a minimum, Aetna pay for the cost of the implants to the hospital. Aetna refused.

51. Another example is Victory Landmark patient R.G. (account no. LK102145). R.G. underwent a combined anterior/posterior spinal fusion on June 2, 2014, was admitted as an inpatient, and then was discharged on June 10, 2014. Aetna authorized R.G.'s surgery and admission. The hospital timely submitted a claim to Aetna; the hospital's total billed charges were $453,560.86, and the implants used in the surgery cost the hospital $64,184.39. After a substantial delay, Aetna allowed $44,214.50, which it stated was 140% of the Medicare allowable. The hospital asked Aetna to send the claim back to be reprocessed and appealed Aetna's low payment of the claim, which was not even sufficient to cover the cost of the implants used in the surgery; Aetna refused to allow any additional payment.

52. Aetna also sometimes denied the Victory hospitals' charges for implants with the argument that the implant was experimental or investigational. However, Aetna had authorized the surgeries at issue, which precludes it from retrospectively denying a claim on this basis. For example, on November 1, 2013, Victory Plano patient K.M. (account no. PL00000204934) underwent an outpatient surgery to implant a neurostimulator. K.M.'s physician's office obtained preauthorization from Aetna for the procedure. The hospital timely submitted a claim to Aetna for the surgery; the claim included the authorization number that Aetna had provided (authorization no. 1665209272). After a substantial delay, Aetna denied the hospital's claim as experimental/investigational in nature, even though it had preauthorized the precise surgery that K.M. had received. Additionally, Aetna paid the physician's claim for performing the exact same surgery. The Hospital appealed Aetna's decision, but Aetna upheld its denial.

**PLAINTIFFS' COMPLAINT – PAGE 20**

53.     Aetna would also sometimes deny for technical reasons not permitted by the patient benefit plans.  For example, for Victory Southcross patient J.B. (Account No. 5010357), the hospital verified J.B.'s benefits with Aetna on May 29, 2013.  Aetna confirmed that it would pay benefits according to the reasonable and customary method, and provided authorization number 437432770000 for the patient's surgery.  The patient underwent surgery, was admitted overnight, and was then discharged the next day.  The hospital timely submitted a claim to Aetna, and Aetna denied it for lack of authorization, even though it had provided an authorization number.  The hospital asked that the claim be sent to appeals, requested a retro-active authorization, and faxed Aetna the patient's medical records.  Aetna then upheld its denial for late notification of inpatient admission, despite having authorized the surgery.

## C.     Victory's Bankruptcy

54.     Despite its best efforts, Victory could not remain in business, as a result of the lack of tens of millions of dollars of appropriate payments by Aetna and other insurers.  The Victory entities (other than Victory East Houston and Victory Beaumont) filed for bankruptcy in June or July 2015, and the last patient to receive medical services from a Victory hospital was in January 2016.

55.     Aetna, along with other insurance companies, attacked Victory due to its growing size and out-of-network status.  Aetna saw Victory as a threat to its business model of steering patients to in-network facilities.  These attacks included, but were not limited to, (1) threats of delisting doctors who performed procedures at Victory facilities, (2) attacks on potential patients by assigning "navigators" to contact patients and use scare tactics to steer those with out-of-network benefits to in-network facilities, and (3) attacks on Victory itself through delayed payments, under-payments, and in 385 cases, no payment at all.

56.     These tactics used by Aetna resulted in lower surgical volumes and lower reimbursements.  Not surprisingly, this had the effect of stressing Victory's earnings and cash flow to the breaking point.  Revenue declined by over 41%, and cash flow from operations which was $34 million in 2013 dropped to $4 million in 2014, rendering Victory insolvent that year. By 2015, Victory no longer had the financial ability to remain a going concern.

57.     To address this shortfall, in 2014, Victory began negotiating with Aetna and the other insurers in earnest to attempt to become an in-network provider.  Ultimately, Aetna and the Victory facilities agreed to the terms of a series of participating provider agreements, one per facility; these agreements provided that the Victory facilities would agree to accept certain specified rates as payment in full for providing services to Aetna members.  Though these rates were lower than the usual and customary rates in the Victory facilities' geographic area, they also required Aetna to pay claims timely, which would have mitigated the delays in payment that the Victory facilities had experienced for years.  These participating provider agreements also included an implant "carve-out" under which Aetna agreed to pay Victory an additional amount for implants used in an Aetna member's surgery; this additional payment was calculated at 110% of the total implant invoice cost.  This payment was in addition to the per diem or case rate that Aetna agreed to pay for the surgery and patient admission.  None of the claims at issue in this case are subject to the terms of those preferred provider agreements.

58.     For all claims at issue in this lawsuit, the patient irrevocably assigned to the Victory facilities all relevant rights that allow Victory to step into the shoes of the patients and both be paid by and seek payment from Aetna for the services Victory rendered, as well as the right to receive all relevant plan documents as a beneficiary (by assignment) of the applicable plans.  Moreover, under the Chapter 11 Plan and Confirmation Order, Plaintiff Neil Gilmour, III,

in his capacity as trustee of the grantor trusts, has succeeded to and holds the interests of Victory's facilities, including all interest held under the assignments.

59.     As part of the bankruptcy process, Plaintiffs have obtained plans which pertain to claims at issue in this litigation and which govern how Aetna ought to have processed some of these claims.  Though the Victory facilities at times requested these and other member benefit Plans during the claims adjudication and appeals process, Aetna routinely refused to provide them, even though the patients' assignments of benefits to Victory gave Victory the right to receive these documents.  To date, the obtained plans provide the following ways in which Aetna is to determine the allowable amount:

- "If you receive eligible out-of-network care, only the amounts within the reasonable and customary 'R&C' limits are considered covered expenses. . . . 'Reasonable and Customary' refers to charges within the normal range of fees in your geographic area for similar services or supplies, as determined by the claims administrator."

- "Please keep in mind that all covered expenses are paid according to what the [Plan] considers the Recognized Charge.  For out-of-network providers, this is the charge most often made for a service."  "Recognized (Reasonable and Customary) Charges" are defined as "You will be reimbursed based on the recognized charge (formerly known as the 'reasonable and customary charge') for a covered medical expense.  The recognized charge is determined by the [Plan] claims administrator based on the fee most commonly charged for a service in a geographic area, or for an in-network provider, a negotiated or discounted fee."

- "All Out-of-Network benefits are paid based on the Reasonable Charge. . . . A Reasonable Charge is the lower of: The provider's usual charge to provide a service or supply; or [t]he charge Aetna determines to be the prevailing charge level made for the service or supply in the geographic area where it is provided."

- "The Plan pays for out-of-network benefits only for the part of a covered expenses that is considered reasonable and customary. . . . The reasonable and customary charge is the lower of:    [t]he provider's usual charge to provide a service or supply; or [t]he charge Aetna determines to be appropriate, based on factors such as: The cost of supplying the same or a similar service or supply; and The manner in which the charges for the service or supply are made, billed or coded. . . .For facility charges: Aetna uses the charge Aetna determines to be the usual charge level for the service in the geographic area where the service is furnished."

- "Cost Sharing for Out-of-Network Benefits You share in the cost of your benefits. . . . You will be responsible for any applicable coinsurance for covered expenses that you incur. Your coinsurance share is based on the recognized charge. . . . The covered expense is only that part of a charge which is the recognized charge. As to medical… expenses, the recognized charge for each service or supply is the lesser of: What the provider bills or submits for that service or supply . . . ."

- "In most cases, Out-of-Network reimbursements are based on the reasonable and customary charge for medically necessary eligible expenses and are subject to the annual deductible. . . . Reasonable and customary charge (or 'recognized charge') is the recognized amount charged for a service or supply that is the lowest of: the provider's usual charge for furnishing the service or supply; the charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made, billed or coded; or the charge Aetna determines to be the prevailing charge level made for the service or supply in the geographic area where it is furnished[.]"

- "Usual and Prevailing Rate. This is the standard fee used by your health plan to determine the maximum amount that is eligible for reimbursement of a treatment, service or supply. The method that your health plan uses to determine the fee may be based on a percentage of the prevailing Medicare rates, or other nationally recognized database. Amounts above the usual and prevailing rate are considered ineligible expenses and will not count toward either the annual deductible or annual out-of-pocket maximum."

- "Aetna will reimburse you for a covered expense, incurred from an out-of-network provider, up to the recognized charge and the maximum benefits under this Plan. . . ." The recognized charge is defined as "The lower of what the provider bills or submits and For inpatient and outpatient charges of hospitals and other facilities; 140% of the Medicare Allowable"

- "For out of network expenses (except for emergency care as defined by Third Party Administrators), after you meet the Plan's annual deductible for out of network expenses, the Plan pays 50% of the maximum allowable charge ["MAC"] and you pay the rest. . . . The MAC is 125% of Medicare's maximum allowable charge for voluntary out-of-network services."

- "The covered expense is the only part of a charge which is the recognized charge…the recognized charge is the lesser of: [w]hat the provider bills or submits…[or] 90% of the Medicare Allowable Rate [] for the Geographic Area where the service is furnished."

60.     Thus, the plans currently available to Plaintiffs reveal that the claims at issue in this litigation will be governed by the two traditional measures for calculating an allowed amount

**PLAINTIFFS' COMPLAINT – PAGE 24**

for out-of-network providers: (1) a reasonable and customary charge, and (2) some percentage of what Medicare would pay for the same or similar charges.   Neither of these methodologies appears to have been used correctly by Aetna in determining the allowed amount for the claims at issue in this case; as explained above, when it *made* payments to Victory, Aetna appears to have nearly always done so by applying 140% of the Medicare allowable (which it contends is the reasonable and customary rate), while simultaneously miscalculating what the Medicare allowable actually was.

61.     Moreover, the terms of these plans often contradict the terms Victory's representatives were told over the phone by Aetna's representatives when they verified the patients' benefits, in the instances where Aetna gave any explanation at all of how the allowed amount would be calculated.   In many instances, Aetna representatives stated that the claims would be paid at the usual and customary rate.   To the extent that the terms of the actual plans provide for reimbursements less than the terms orally provided, Victory performed its medical procedures after having been given the false impression by Aetna that its claims would be priced on more favorable terms.

**D.      Aetna's Failure to Provide Plan Documents**

62.     The civil enforcement section of ERISA, particularly Section 502(c) (codified at 29 U.S.C. § 1132(c)(1)(B)) provides that a participant or beneficiary is entitled to request claims rejection information from the administrator.   If the administrator does not provide the information within thirty days, the administrator may be liable for up to $110 a day, per claim. As noted above, Aetna is the *de facto* plan administrator in administering these claims and thus liable for failure to produce requested documents.

63.     Victory has requested from Aetna both plan and plan associated documents on claims made by Victory.   Aetna refused to provide these documents in the normal course of

business.  Rather, Aetna only agreed to produce a handful of plans through the bankruptcy Rule 2004 process.  Victory is entitled to the requested plan documents and associated documents. Victory is also entitled to a civil penalty of $110 per day for the failure to timely comply with the request under 29 U.S.C. § 1132(c), until the documents are produced.

## V.  CLAIMS FOR RELIEF

### Count 1:
### Aetna's Failure to Comply with the Applicable Plans in Violation of ERISA
### (Against all Defendants)

64.     Plaintiffs incorporate by reference the preceding paragraphs.

65.     Victory is entitled to enforce the terms of the plans, as assignee of patients/members under 29 U.S.C. § 1132(a)(1)(B), for whom Aetna has made claims determinations without following the applicable plan language and in an arbitrary fashion, and to obtain appropriate relief under such provision.   Under § 502(a) of ERISA, Victory (as beneficiary and assignee) is entitled to recover benefits due to it and/or the patients from whom Victory received Assignments of Benefits, under the terms of the plans between the patients and Aetna.

66.     Victory provided services to the Aetna members at issue that are covered under the terms of their respective benefit plans.  However, Aetna failed to adjudicate and pay those claims in accordance with those agreements.  As explained above, the majority of those benefit plans required Aetna to reimburse an out-of-network provider such as Victory at the usual and customary rate, but it did not do so.  Instead, it paid Victory facilities amounts that were below the usual and customary rate in the relevant geographic area, and often paid the Victory facilities less than Victory had paid for the implants that were used in the patient's surgery.  Even where the patient's plan specified that Victory was to be paid for covered services using a different

payment methodology, such as 140% of the Medicare allowable, Aetna failed to pay the correct amount.

67.     Aetna acted as a fiduciary to its beneficiaries, including Victory as assignee, because Aetna exercised discretion in determining whether plan benefits would be paid, and/or the amounts of plan benefits that would be paid, to those plan beneficiaries.  As a fiduciary under ERISA, Aetna is subject to a civil action under § 502(a) of ERISA.  In violation of ERISA, Aetna failed to make payments of benefits to Victory as assignee, as required under the terms of the plans between the patients and Aetna.  In further violation of ERISA, Aetna failed to provide Victory as assignee with all the rights under the terms of the applicable plans between the patients and Aetna, as required by ERISA.  Aetna failed to make clear to Victory as assignee its rights to future benefits under the terms of the applicable plans as required by ERISA.

68.     Aetna breached the terms of the plans by making claims determinations that had no basis in those terms, without valid evidence or information to substantiate such determinations and departures from the terms of the applicable plans, and/or in an arbitrary fashion.

69.     As a proximate result of Aetna's wrongful acts, Victory has been damaged in the tens of millions of dollars, an amount in excess of the jurisdictional floor of this Court.  Victory seeks to recover all unpaid benefits that are owed to it under the terms of the patient benefit plans for providing covered services to Aetna's members.[11]

---

[11]     A list of the claims that Plaintiffs contend were not paid correctly and are at issue in this litigation will be provided to Aetna on an encrypted CD when summons is served (or when Aetna agrees to waive service of summons) in order to protect the confidential patient information at issue.  That list of claims is incorporated herein by reference under Federal Rule of Civil Procedure 10.  Through pre-suit notices and negotiations, as well as the discovery conducted in the bankruptcy proceeding, Plaintiffs have already provided Aetna with a list of the majority of the claims at issue in this litigation.  The Trustee's investigation into Aetna's conduct and claims handling is ongoing, and Plaintiffs reserve the right to add additional healthcare claims as they are discovered.

**PLAINTIFFS' COMPLAINT – PAGE 27**

**Count 2:**
**Aetna's Breach of Fiduciary Duties Under ERISA**
**(Against all Defendants)**

70.     Plaintiffs incorporate by reference the preceding paragraphs.

71.     Victory, as the assignee of ERISA subscriber/members, is entitled to assert a claim for relief from Aetna's breaches of the fiduciary duties of loyalty and care under 29 U.S.C. § 1132(a)(3).

72.     Aetna acted as a fiduciary to Victory as an assignee in connection with the beneficiaries' group health plans, as such term is understood under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   In its capacity as the insurer, plan administrator, claims administrator and/or fiduciary of ERISA group plans, Aetna is a fiduciary.

73.     Aetna breached its duties to Victory as assignee by not paying and by underpaying claims for covered services that Victory provided to Aetna plan members in accordance with the terms of the applicable plans, and by doing so in an arbitrary fashion. Specifically, Aetna acted as a fiduciary to Victory as assignee because Aetna exercised discretion is determining whether plan benefits would be paid, and if so, at what amount.  The exercise of discretion in such determinations of plan benefits is an inherently fiduciary function that must be carried out in accordance with the terms of the applicable plans, not in a manner to maximize the interests of Aetna.

74.     By engaging in such conduct described above, Aetna failed to act with the care, skill, prudence and diligence that a prudent plan administrator would use in the conduct of an enterprise of like character or to act in accordance with the documents and instruments governing the applicable plans. ERISA §§ 404(a)(1)(B) and (D), 29 U.S.C. §§ 1104(a)(1)(B) and (D).

75.     As a fiduciary of group health plans under ERISA, Aetna owes beneficiaries a duty of loyalty, defined as an obligation to make decisions in the interest of beneficiaries, and to

avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of the beneficiaries.  Aetna violated its fiduciary duty of loyalty by, among other things, determining whether plan benefits would be paid, and/or determining the amounts of plan benefits that would be paid, to those plan beneficiaries based on maximizing benefits to Aetna rather than making its determinations based on the terms of the applicable plans.

76.     Victory is entitled to relief for Aetna's violation of its fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including restitution, injunctive and declaratory relief, and its removal as a breaching fiduciary.

77.     As a direct and proximate cause of Aetna's ERISA breaches, Victory has been damaged in an amount in excess of the jurisdictional limits of the Court.

### Count 3:
### Aetna's Failure to Provide Full and Fair Review Under ERISA
### (Against all Defendants)

78.     Plaintiffs incorporate by reference the preceding paragraphs.

79.     Aetna functions as the "plan administrator" within the meaning of such terms under ERISA when it insures a group health plan, or when it is designated as a plan administrator for such plan.   As such, Victory is entitled to assert a claim for relief under 29 U.S.C. § 1132(a)(3).

80.     Although Aetna was obligated to provide a "full and fair review" of all claims, it failed to do so in connection with the claims submitted by Victory, and otherwise failed to make necessary disclosures pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder).

81.     As a direct and proximate cause of Aetna's failure to comply with 29 U.S.C. § 1133, Victory has been damaged in an amount in excess of the jurisdictional limits of the Court.

**PLAINTIFFS' COMPLAINT – PAGE 29**

**Count 4:**
**Aetna's Violations of Claims Procedures Under ERISA**
**(Against all Defendants)**

82.     Plaintiffs incorporate by reference the preceding paragraphs.

83.     Aetna is an insurance company that is subject to regulation under the laws of more than one state, including the State of Texas.  Further, Aetna processes benefit claims for self-funded plans providing claims filing and notices of decisions to policyholders in such plans.

84.     Aetna is an insurance company and must comply with claims procedures defined by law (e.g., 29 C.F.R. § 2560.503-1) for subscribers and members. Victory is therefore entitled to seek additional relief as Aetna is an insurance company which failed to comply with federal law. 29 U.S.C. § 1132(a)(3).

85.     Aetna violated these claims procedure regulations by engaging in conduct that rendered its claims procedures and appeals process unfair to subscribers and their assignee.

86.     As a direct and proximate result of Aetna's violation of such regulations, Victory has been harmed in an amount in excess of the jurisdictional floor of the Court.

**Count 5:**
**Violations of the Texas Insurance Code**
**(Against all Defendants)**

87.     Plaintiffs incorporate by reference the preceding paragraphs.

88.     In addition to Aetna's failure to reimburse Victory in accordance with the terms of the patient's benefit plans, Aetna has failed to follow Texas law with respect to emergency services.  Texas law requires Aetna to reimburse an out-of-network provider of emergency services at the usual and customary rate, regardless of the terms of the plan.  *See* Tex. Ins. Code § 1271.155; 28 Tex. Admin.  Code § 3.3725.  Aetna has failed to comply with these statutes and has reimbursed Victory for less than the usual and customary rate for emergency services provided to Aetna's members.

**PLAINTIFFS' COMPLAINT – PAGE 30**

89.     Aetna's acts and omissions described above also constitute violations of Texas common law and the Texas Insurance Code.  By arbitrarily delaying and failing to timely pay claims, Aetna is in violation of the Texas Prompt Pay Statute, Tex. Ins. Code § 542.058, among other sections.   Plaintiffs also seek recovery of prompt pay penalties applicable to health maintenance organizations and preferred provider organizations under the Texas Insurance Code for claims for emergency services that were not paid within the time specified by the Texas Prompt Pay Act.  28 Tex. Admin. Code § 21.283; Tex. Ins. Code §§ 843.338 and 1301.103. Further, the acts and omission constitute an illegal boycott or an act of coercion in violation of Tex. Ins. Code § 541.003, and are therefore acts of unfair competition within the State of Texas.

90.     As a direct and proximate result of Aetna's violations of such regulations and laws, Victory has been harmed in an amount in excess of the jurisdictional limits of the Court.

**Count 6:**
**Breach of Contract**
**(Against all Defendants)**

91.     Victory incorporates by reference the preceding paragraphs.

92.     As noted above, some of the claims made the basis for this lawsuit are not controlled by plans governed by ERISA.  For these claims, Aetna is liable to Victory for its failure to process and pay claims under the terms of the applicable plans based on Aetna's breaches of its contracts with its insureds (which those insureds assigned to their respective Victory hospital).  Specifically, in those insurance agreements, Aetna agreed to pay an out-of-network provider such as Victory using a specified payment methodology (usually the usual and customary rate).   Victory provided covered services to Aetna insureds, and those insureds assigned their insurance contract benefits to Victory.  However, Aetna failed to pay Victory in accordance with the terms of the insurance contracts, thereby breaching the contracts.

93.     As a direct and proximate result of Aetna's breach of contract, Victory has been damaged in an amount in excess of the jurisdictional floor of the Court.

### Count 7:
### Promissory Estoppel and Negligent Misrepresentation
### (Against all Defendants)

94.     Victory incorporates by reference the preceding paragraphs.

95.     Victory brings a claim for promissory estoppel in its own right as a third-party provider.  Aetna members received healthcare services at Victory's facilities.  Before scheduling any non-emergent procedure for Aetna members, Victory contacted Aetna to confirm whether coverage was available for the scheduled services and to obtain the specific coverage details for that patient's insurance plan, as described above.

96.     As part of that process, Aetna would often provide the basis upon which it would determine the allowed amount.  As noted above, discovery in the bankruptcy has revealed that Aetna would often provide a basis that was more advantageous to Victory than the actual terms contained in the applicable plan for determining the allowed amount.

97.     In such instances, Victory has a separate cause of action for promissory estoppel and negligent misrepresentation to recover the difference between the level of benefits that were promised to it by Aetna's representatives and the level of reimbursement actually paid.

98.     By confirming coverage in this manner, Aetna made a clear and definite promise to pay Victory for each of the services provided according to the allowed amount communicated by it. These unambiguous promises constitute an obligation Aetna owes to Victory independent of the obligations Aetna owes to their own members under the applicable plans.

99.     Victory did not have access to any of the applicable plans covering Aetna members, and therefore had to rely upon the information provide by Aetna's agents, in order to

determine whether and at what amounts Victory would be reimbursed for services performed for Aetna members.

100.    Based upon these representations, Victory provided services to Aetna members. Victory's reliance on these representations was foreseeable to Aetna. Through the communications between Victory and Aetna, Aetna knew that Victory was attempting to determine coverage information for Aetna members.

101.    Victory's reliance upon Aetna's coverage and benefit payment promises was detrimental to Victory's business operations and cash flow. After providing these medical procedures, Victory submitted proper claims to Aetna for payment of benefits in accordance with Aetna's representations.

102.    Despite its obligation to pay each claim, Aetna failed, and continues to fail, to pay Victory consistent with the representations made by its agents and its unambiguous promise to pay for the services provided to its members. Aetna is required to pay benefits in amounts consistent with the statements made to Victory while confirming coverage.

103.    As a direct and proximate result of its reliance on Aetna's unambiguous promises, Victory has been harmed in an amount in excess of the jurisdictional floor of the Court.

## VI.  ERISA PENALTIES AND EXEMPLARY DAMAGES

104.    Victory incorporates by reference the preceding paragraphs.

105.    Aetna's failure to comply with the requests for plan information pursuant to 29 U.S.C. § 1132(c)(1) as described above subjects it to civil penalties in the amount of $110 per claim per day for such failure and refusal to provide the requested documents. As such, Victory is entitled to the requested documents and to the $110 per claim per day civil penalty.

106.    As described above, Aetna's actions and omissions regarding payment of Victory's valid claims was a direct and proximate cause of its bankruptcy. Aetna's willful and

intentional acts were committed with malice, justifying the imposition of punitive and exemplary

damages, in an amount in excess of the jurisdictional floor of the Court.

## VII.  ATTORNEYS' FEES

107.    Victory incorporates by reference the preceding paragraphs.

108.    Victory has been required to retain counsel to pursue its claims in this litigation.

109.    Pursuant to 29 U.S.C. § 1132(g), Tex. Civ. Prac. & Rem. Code §§ 38.001, et seq.,

and Fed. R. Civ. P. 54(c), Victory is entitled to an award of attorneys' fees.

## VIII.  JURY DEMAND

110.    Victory demands a jury for all its causes of action for which it has a right to a jury

trial.

## IX.  PRAYER

111.    For all the foregoing reasons, Plaintiffs asks for:

- judgment of and against Aetna for damages;

- attorneys' fees;

- both pre-judgment and post-judgment interest at the highest rates allowed by law;

- taxable costs;

- the entry of an order requiring Aetna to produce all applicable plans and associated documents; and

- such other and further relief to which Plaintiffs may show themselves to be justly entitled.

Dated: June  8, 2017

**PLAINTIFFS' COMPLAINT – PAGE 34**

Respectfully submitted,

THOMPSON & KNIGHT LLP

By: ___*/s/ Jennifer Rudenick Ecklund*___
    Jennifer Rudenick Ecklund
    State Bar No. 24045626
    Jennifer.Ecklund@tklaw.com

    Andrew Cookingham
    State Bar No. 24065077
    Andrew.Cookingham@tklaw.com

    Reed C. Randel
    State Bar No. 24075780
    Reed.Randel@tklaw.com

    One Arts Plaza
    1722 Routh Street, Suite 1500
    Dallas, Texas 75201
    (214) 969-1700
    FAX (214) 969-1751

    ATTORNEYS FOR PLAINTIFFS