# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NEIL GILMOUR, III, TRUSTEE FOR THE GRANTOR TRUSTS OF VICTORY PARENT COMPANY, LLC, VICTORY MEDICAL CENTER CRAIG RANCH, LP, VICTORY MEDICAL CENTER LANDMARK, LP, VICTORY MEDICAL CENTER MID-CITIES, LP, VICTORY MEDICAL CENTER PLANO, LP, VICTORY MEDICAL CENTER SOUTHCROSS, LP, VICTORY SURGICAL HOSPITAL EAST HOUSTON, LP, AND VICTORY MEDICAL CENTER BEAUMONT, LP, | § § § § § § § § § § § § § | |
| **Plaintiffs,** | § § | CIVIL ACTION NO. 5:17-CV-00510-FB |
| v. | § § | |
| AETNA HEALTH INC., AETNA HEALTH INSURANCE COMPANY, AND AETNA LIFE INSURANCE COMPANY, | § § § § § | |
| **Defendants.** | § § | |

## DEFENDANTS' MOTION FOR SANCTIONS AND SUPPORTING BRIEF

OF COUNSEL:
HUNTON ANDREWS KURTH LLP
and
M. KATHERINE STRAHAN
State Bar No. 24013584
*kstrahan@HuntonAK.com*

JOHN B. SHELY
State Bar No. 18215300
*jshely@HuntonAK.com*
HUNTON ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Telecopier: (713) 220-4285

**ATTORNEY-IN-CHARGE**
**FOR DEFENDANTS**

Defendants move for sanctions against (1) Plaintiff Neil Gilmour, III, Trustee for the Grantor Trusts of Victory Parent Company, LLC, Victory Medical Center Craig Ranch, LP, Victory Medical Center Landmark, LP, Victory Medical Center Mid-Cities, LP, Victory Medical Center Plano, LP, Victory Medical Center Southcross, LP, Victory Surgical Hospital East Houston, LP, and Victory Medical Center Beaumont, LP, ("*Victory*"), and (2) non-party Robert N. Helms, Jr. ("*Helms*"), under Rule 11 and, additionally, the Court's inherent power.

## I.      INTRODUCTION

This case is part of a wider criminal enterprise to defraud private health plans. Victory physicians and investors have already been convicted of charges related to commercial bribery and kickbacks at Forest Park Medical Center, and the convicted felons in that case described, under oath, an identical scheme at Victory led by Helms (Victory's CEO). Now, Helms—the criminal co-conspirator—is driving Plaintiff to pursue this suit against Aetna—a fraud victim—for additional money. By pursuing this case, Plaintiff and Helms are using the federal courts to obtain further profits from criminal conduct, which is a sanctionable abuse.

More specifically, led by Helms, Victory's principals conspired to defraud Aetna in an elaborate out-of-network billing scheme that bilked the healthcare industry of hundreds of millions of dollars. Helms illegally paid consultants and physicians huge amounts of money for patient referrals, and then collected egregious sums of money for those services from the payers, including Aetna, based on false charges. When the payers caught on to *some* of Victory's schemes and accordingly reduced payments, Victory could not afford to continue to pay off its co-conspirators, which is why its business (rightfully) failed.

As a result of its failed criminal enterprise, Victory filed for bankruptcy. Helms then created a company, Torch Recovery Services, to serve as a "Collection Agent" on accounts

-1-

receivable (the only identified assets) for the Grantor Trusts and to "advise" the Trustee Plaintiff in the lawsuits against the payers (i.e., commercial health plans).[1] Helms also created another company, HPRH Investments, to buy all of Victory's secured debt and become the sole Secured Creditor of the Estate. As such, Helms ensured his involvement and control over the bankruptcy proceedings. Aided and abetted by Plaintiff, Helms' insurance scam continues as he uses his role as Collection Agent and sole Secured Creditor to facilitate the suits against the payers, the very same victims of his fraud scheme, by pursuing fraudulent medical claims.

To further his fraudulent efforts, Helms has used his personal criminal and in-house lawyers to "represent" witnesses who are arguably co-conspirators in the underlying fraud scheme and to aid him in concealing the truth in this case, as explained below. Helms is a non-party in name only. He is the mastermind behind Victory's numerous fraudulent schemes and the number one beneficiary of any recovery in the bankruptcy proceedings.[2] Under its inherent powers, the Court may sanction Helms for his improper conduct in this case and should do so.

For his part, given his role in other adversary proceedings for Victory, Plaintiff knew that his claims lacked merit when filing this lawsuit. And after discovery, Plaintiff is aware that this case literally involves a crumbling criminal enterprise for healthcare fraud and is nothing but an exploitation of the judicial process to further shake down a victim of Victory's fraud. While Helms may be calling the shots, Plaintiff, as Trustee, has independent responsibilities to this Court (and the Bankruptcy Estate) to proceed only in good faith and in an impartial manner. As such, Plaintiff should be sanctioned for pursuing these claims and

---

[1]   Ex. 35, at pp. 10, 15, 18, 21-22, & 31-41; Ex. 2, at 10, 12, 48.

[2]   Plaintiff's counsel represented that Helms must agree to any resolution of this case. Dkt. 89, at p. 33:01-06.

-2-

causing Aetna to defend this case at significant cost to get to the truth.

Under Rule 11(c)(2), Aetna served this motion on Plaintiff and Helms on October 8, 2019, well over twenty-one (21) days ago. Plaintiff did not dismiss this suit but forced Aetna to incur further legal fees on summary judgment briefing, and Plaintiff and Helms should be sanctioned. Specifically, Aetna requests that the Court (1) dismiss Plaintiff's claims, and (2) award Aetna its reasonable fees and costs incurred in defending this action, including preparing and filing this motion, against Plaintiff and Helms. While ordering sanctions is an extraordinary remedy, the conduct and abuses that have occurred here are likewise extraordinary. This case and these bad actors epitomize the need for Rule 11.

## II.      BACKGROUND

### A.      Plaintiff Sued For Underpayments And Aetna Countersued For Fraud

Plaintiff filed suit against Aetna in June 2017, alleging that Aetna failed to correctly pay Victory's facility (or hospital) charges on claims submitted under Aetna's health plans. When Aetna asked Plaintiff to disclose the basis for the alleged underpayments under the plans, Plaintiff said he could not do so until his expert disclosures. Putting aside that Plaintiff should have well known the basis for the alleged underpayments prior to initiating suit, Plaintiff's expert still failed to show any basis for any alleged underpayment. *See infra* at IV.B.

Meanwhile, Aetna asserted fraud claims and defenses based on Victory's billed charges and published reports of Victory's operations. In May 2018, Aetna supplemented its allegations, including that Victory: (1) made lucrative kickback payments to physicians for performing elective procedures at Victory's pricey out-of-network facilities; (2) overcharged for services, especially implants; (3) billed for services that were not provided; (4) waived

patient financial responsibility as required by the plans; and (5) submitted false claims.[3]

Significantly, in his deposition in May 2019—*a **year** later*—Plaintiff admitted that he had not "look[ed] into" Aetna's allegations.[4] Plaintiff must have found them credible because he initially thwarted Aetna's discovery requests regarding alleged kickbacks. Regardless, Plaintiff had an ethical and legal obligation to investigate Aetna's fraud allegations once he became aware of them. Failure to do so is willful ignorance and does not shield him from liability. Of course, the evidence eventually produced substantiates Aetna's claims.

**B.     Plaintiff Initially Resisted Much Of Aetna's Requested Discovery, But The Evidence Uncovered Proves Victory Schemed To Defraud Aetna**

   **1.     *Plaintiff refused to produce evidence of physician financial arrangements***

During initial discovery, Aetna suspected that physician kickbacks were funneled through purported "marketing" vendors. Plaintiff refused, however, to produce any marketing agreements or even a corporate representative on Victory's relationship with physicians.[5] Furthermore, in his deposition on February 28, 2019, Plaintiff's Rule 30(b)(6) representative on Victory's *operational costs*, Randy Gabriel ("Gabriel"), claimed to know nothing about the purpose of *tens of millions of dollars in payments to "related" marketing and implant companies* in Victory's financial documents.[6] He further denied knowledge of implant costs at all,[7] which is extraordinary given that Plaintiff's Complaint alleges that "Aetna did not []

---

[3]     Docket No. 34 at ¶¶ 8-11.

[4]     Ex. 2, Dep. Tr., Neil Gilmour, at 144:14-146:02.

[5]     *See, e.g.,* Ex. 3 (Plaintiff's counsel's letter of February 27, 2019 refusing production).

[6]     Ex. 4, Feb. 28, 2019 Dep. Tr., Randy Gabriel ("Gabriel I Dep."), at 170:07-174:17.

[7]     Ex. 4, Gabriel I Dep., at 117:25-119:12, 128:03-25.

-4-

allow enough to cover the cost of the implants that Victory provided to the patient   . . . ."[8] Gabriel's fear of admitting the truth is unsurprising given what has been revealed.

### 2. *Aetna obtained relevant testimony from the Forest Park trial*

Shortly after Gabriel's deposition, Andrew Hillman ("Hillman") testified about Victory's physician kickback schemes in a criminal trial in the Northern District of Texas (the "Forest Park" case). Hillman was a Victory investor who worked closely with Helms and another investor, Robert O'Neal, to recruit physicians, and Victory considered Hillman and O'Neal to be instrumental to Victory's business.[9] Hillman and several physicians were indicted on charges related to kickbacks for referrals at Forest Park Medical Center. Hillman testified in that trial on March 6, 2019, and, under oath, Hillman outlined *Victory's* scheme (like that of Forest Park) to: (1) charge egregiously high prices to private insurers, while waiving the patient's financial responsibility; and (2) obtain business by paying physicians enormous sums for performing surgeries through marketing and implant vendors.[10] The jury found Forest Park physicians, who had the same deals at Victory, *guilty*.

In April 2019, Aetna asked to depose Hillman under Rule 30(a)(2)(B), and despite the obvious relevance, Plaintiff opposed Aetna's motion, which the Court granted. In deposition, Hillman refused to answer all questions based on a claim of the Fifth Amendment privilege, other evidence corroborates Hillman's testimony and independently establishes that Victory paid excessive sums to induce physicians to perform or refer cases to its facilities.[11]

---

[8]   Dkt. 1 at ¶ 3.

[9]   Ex. 5, at V0110591.

[10]   Ex. 6, *USA v. Beauchamp*; No. 3:16-cr-00516-JJZ; Tr. Vol. 9 at 209:20-21; 220:02-11.

[11]   *See* Dkt. 98 (Aetna's motion to admit Hillman testimony and for adverse inference).

-5-

### 3. *Victory tracked and paid millions of dollars for case referrals*

It is generally illegal to pay or accept remuneration to induce anyone to refer patients for healthcare services. Tex. Occ. Code Ann. § 102.001. Remuneration can take various forms,[12] and regardless of whether Victory paid physicians cash directly, Victory clearly financially incentivized physicians to refer patients to and/or perform surgeries at its facilities.

Here, Victory paid Hillman's company, Advanced Total Management ("ATM"), and O'Neal's company, A-Positive, Inc. ("API"), millions of dollars per month in "marketing" fees.[13] These marketing dollars were, in turn, paid to marketing companies associated with certain physicians.[14] Victory tracked the number of "cases" (or procedures) performed by each of these physicians,[15] and evaluated and adjusted the marketing fees based on the physician's volume of cases.[16] Physicians would not perform cases at Victory unless their marketing companies were paid.[17] *See* Tex. Penal Code Ann. § 32.43(b) (prohibiting a physician from accepting a benefit with the understanding that it will influence conduct regarding the patient).

Victory financially incentivized physicians in other ways as well. For example:

---

[12] Texas law has adopted the same factors used by the Office of Inspector General (OIG). *See* Tex. Occ. Code Ann. § 102.001(a). The OIG's factors include, *inter alia*: investors being chosen because they are in a position to make referrals; physician investors being actively encouraged to make referrals and to divest their ownership interest if they fail to sustain an "acceptable" level of referrals; and the joint venture tracking its sources of referrals. *See* HHS, Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65,372, 65,374-75 (Dec. 19, 1994).

[13] Ex. 1, at 208:14-21; Ex. 8, Dep. Tr.,Tanya Snodgrass, at 319:25-321:24, 327:23-328:21; Ex. 9, Dep. Tr., Shannon Osteen, at 232:14-22.

[14] Ex. 8, Snodgrass Dep., at 127:02-128:25, 174:05-176:22, 270:11-272:13.

[15] Ex. 38, Nov. 18, 2019 Dep. Tr. Randy Gabriel ("Gabriel II Dep.) at 141:18-144:18.

[16] Ex. 38, at 93:6-94:23; Ex. 10, Dep. Tr., James Hermes, at 103:23-104:23; 113:5-114:10.

[17] Ex. 8, at 285:19-286:25. Victory also paid hundreds of thousands dollars under "direct" marketing contracts. With respect to one in particular, Victory paid ███████████████████████ ████████████████████████████████████ Ex. 11, Dep. Ex. 97.

-6-

- Victory offered physicians ownership interests in facilities based on the anticipated number and types of cases referred.[18]

- Victory paid for surgeons to travel to screen patients as candidates for surgery.[19]

- Victory paid rent for physician clinics who referred cases to Victory.[20]

- Victory financed a building for a Beaumont surgeon to open a practice in Houston so he could perform cases at Victory East Houston.[21]

Thus, while Aetna has had to incur considerable costs in discovery, there is ample evidence of physician remuneration for cases at Victory. And regardless of whether Victory technically violated anti-kickback or commercial bribery statutes, the millions paid for these illicit referrals were part of Victory's overall costs,[22] which were passed on to Aetna.

### 4.  *Plaintiff knew that Victory paid excessive implant costs for case referrals*

Prior to this case, Plaintiff filed claims on behalf of Victory against implant companies controlled by Hillman, including L2 Surgical and Vertelogic. Plaintiff alleged that these companies systematically overcharged Victory for implants between 2012 and 2015, often 400% or more *over* fair market value,[23] which Victory then marked up *another* 400% when billing Aetna.[24] Plaintiff alleged that surgeons had financial interests in these implant companies and directed Victory to buy their overpriced implants for their surgeries.[25]

---

[18]   Ex. 10, Hermes Dep., at 184:18-188:25; Ex. 12, Dep. Ex. 127 (discussing, *inter alia*, ██████

[19]   Ex. 10, Hermes Dep., at 193:22-195:6.

[20]   Ex. 1, Helms Dep., at 207:04-208:03.

[21]   Ex. 10, Hermes Dep., at 163:10-164:25.

[22]   Ex. 4, Gabriel Dep., at 197:02-21.

[23]   Ex. 14, A0316545, at ¶ 45.

[24]   Ex. 13, Mar. 1, 2019 Dep. Tr., Kelly Russell ("Russell Dep.") at 250:03-12.

[25]   Ex 15, A031523-A031525, at ¶¶ 50-55; Ex. 37, at 80:2-22; 84:14-19; 140:6-21.



Helms, in fact, agreed with physicians to ███████████████████████

███████████████████████████████████████████████████████

███████[26] Moreover, Helms agreed to pay ████████████████████

███████████████████████████████████████████████████████

███████[27] Again, Plaintiff alleged that Victory paid L2 Surgical excessive amounts, so the

same must be true for ██████████implants, despite self-serving references to "reasonable

retail rates." ***Plaintiff thus knew*** of Victory's kickbacks and excessive charges for implants,[28]

yet has specifically alleged that Aetna's payments failed to cover Victory's implant costs.

    **5.**     ***Victory's business failed due to the collapse of its fraudulent scheme***

Eventually, Victory's scheme imploded. Around April 2013, Cigna stopped paying

Victory's claims due to waiver of patient financial responsibility,[29] and in August 2013, Aetna

began reducing payments. Although Aetna was unable to unearth all of the intricacies of

Victory's fraudulent operations at the time, many of Victory's claims underwent additional

review for overbilling. Victory's financial problems were driven by the enormous sums of

money that it paid in kickbacks—more than ███████████████[30] When Victory could not

pay off the physicians, they stopped sending their cases to Victory. Helms himself said in late

███████████████████████████████[31] This is why Victory went bankrupt.

---

[26]   *See, e.g.*, Ex. 1, Helms Dep., at 270:09-271:05 & Ex. 16, Dep. Ex. 76.

[27]   Ex. 17, Dep. Ex. 75.

[28]   The OIG has warned against the inherent conflict of interest in physicians profiting from implants used in surgeries and the dangers of excessive costs to hospitals who purchase them. *See* Ex. 18, OIG Special Fraud Alert, 3/26/2013. ***All of those concerns are implicated here.***

[29]   Ex. 10, Hermes Dep., at 63:23-66:22.

[30]   Ex. 4, Gabriel Dep., at 196:04-197:01.

[31]   Ex. 20, V0114026.

As long as they all were making money, Helms was content with his business partners, O'Neal and Hillman. When their schemes caught up with them, they all turned on each other. In 2015, Victory sued O'Neal, alleging that Victory paid millions to him "in bogus/unearned 'marketing fees.'"[32] In 2016, Hillman (though L2 Surgical) filed suit against Victory for non-payment of implant invoices. Victory (through this Plaintiff/Trustee) countered that Hillman designed physician kickback schemes and sold surgical devices to Victory for an exorbitant cost.[33] As such, Plaintiff admits to the truth of Hillman's testimony in his own pleadings.

Even if Victory were the victim of Hillman and O'Neal as Plaintiff now claims, Plaintiff cannot pass on this cost of fraud to Aetna. Mike Austin (a principal in L2 Surgical) testified that during the mediation with the Trustee in the L2 Surgical case, it was said that Victory intended to use whatever proceeds it could get in that case "**to fund a lawsuit against the insurance companies.**"[34] So instead of returning Aetna the money that Plaintiff collected for Hillman's fraud, he uses that money to pay lawyers, experts and Helms, to pursue Aetna for $25 million.[35] This is an unabashed money grab **that drives up the cost of healthcare** by rewarding the greed of some failed entrepreneurs; it is sanctionable.

## III.   ARGUMENT AND AUTHORITIES

### A.   The Court May Award Sanctions Against Plaintiff And Helms For Pursuing Groundless Claims For Improper Purposes

The Court may award sanctions against Plaintiff under Rule 11 for pursuing groundless

---

[32]   Ex. 21, Plaintiff's Second Amended Petition, at ¶ 66.

[33]   Ex. 15 at pp. 7-8.

[34]   *See, e.g.*, Ex. 37, Excerpts of Deposition of Mike Austin at 41:22-42:13.

[35]   As Collection Agent and sole Secured Creditor, Helms has received the collections to date. No money is expected to go to the unsecured creditors. Ex. 38, Gabriel II Dep. at 32:2-19.

011168.0268748 HOU 3963554v1

claims and/or claims in bad faith. The Court may also award sanctions against Plaintiff *and* Helms under its inherent power for abuse of the judicial process by pursuing claims that knowingly further a criminal enterprise and obstructing the discovery process.

### 1.    *Rule 11 Authorizes Sanctions For Improper Claims*

Rule 11 imposes affirmative duties on parties to present factual allegations that have evidentiary support, to make only legal claims warranted by existing law (or a non-frivolous argument to modify same), and to avoid filing claims for an improper purpose. FED. R. CIV. P. 11(b).[36] A violation of Rule 11 justifies sanctions.[37] A party can be sanctioned for failing to make a reasonable inquiry into the factual basis of a claim.[38] Further, the party's obligations with respect to the claims asserted are not measured solely as of the time they are submitted to the court, but also "in reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit."[39]

Under Rule 11(b)(1), courts also can impose sanctions for presenting pleadings for an improper purpose.[40] Courts typically deem a party's purpose to be improper where, as here,

---

[36]    *Thomas v. Capital Sec. Servs., Inc.*, 812 F.2d 984, 988 (5th Cir. 1987), *on reh'g*, 836 F.2d 866 (5th Cir. 1988).

[37]    *Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 802 (5th Cir. 2003) (en banc).

[38]    *Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 567 (5th Cir. 2006).

[39]    *See* FED. R. CIV. P. 11 advisory committee's note to 1993 amendment, 146 F.R.D. 401, 585 (1993); *Buster v. Greisen*, 104 F.3d 1186, 1189-90 n.4 (9th Cir. 1997); *Battles v. City of Ft. Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997); *Mestayer v. Wis. Physicians Serv. Ins. Corp.*, 905 F.2d 1077, 1081 (7th Cir. 1990).

[40]    *See Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548-49 (5th Cir. 2001); *Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 537 (5th Cir. 1990); *see also FDIC v. Maxxam, Inc.*, 523 F.3d 566, 581 (5th Cir. 2008). The Fifth Circuit employs a two-step test for determining an improper purpose: (1) determining if the initial filing is well grounded in fact and warranted by existing law, and if so, (2) whether it was filed under unusual circumstances constituting sanctions. *FDIC v. Calhoun*, 34 F.3d 1291, 1300 (5th Cir. 1994).

evidence indicates an ulterior motive beyond the stated purpose of the filing.[41] The Supreme Court has upheld sanctions for a party's bad faith manner of pursuing the case, including tactics of delay, harassment and massive expense.[42] In terms of timing, a pleading may be sanctionable at the summary judgment stage.[43] Sanctions are appropriate at this stage here.

### 2. *The Court Has Inherent Power To Sanction Plaintiff <u>And</u> Helms*

Additionally, the Court may exercise its inherent power to impose sanctions to control the litigation and remedy bad faith delays or obstruction of proceedings.[44] That power extends to non-parties that may be beyond the purview of Rule 11 but are closely tied to the litigation.[45] The Eastern District of Texas, for example, has applied a two-part test to determine whether the court's inherent power extends to a non-party: "To be subject to the Court's inherent power to sanction, a non-party . . . must (1) have a substantial interest in the outcome of the litigation and (2) substantially participate in the proceedings in which he interfered."[46] Other courts have also recognized the authority to sanction non-parties "entwined" in the

---

[41] *Castro & Co. v. Diamond Offshore Servs. Ltd.*, No. 3:18-cv-574-M, 2018 WL 6069973, at *11 (N.D. Tex. Oct. 29, 2018).

[42] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 41 (1991).

[43] *Prestige Land Iran Co. v. Hilti, Inc.*, No. 3:15-CV-3734-L, 2018 WL 2984859, at *2 (N.D. Tex. June 14, 2018); *McMahan v. First Union Nat'l Bank*, No. Civ.A. SA-01-CA-782F.B., 2003 WL 21339370, at *1 (W.D. Tex. June 10, 2003); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990).

[44] *Gibraltar Cable Barrier Sys., LP v. Neusch*, No. 1:16-CV-418-LY-ML, 2017 WL 5202879, at *7 (W.D. Tex. Sept. 22, 2017) (quoting *NASCO, Inc. v. Calcasieu Tele. & Radio, Inc.*, 894 F.2d 696, 703 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)); *see also Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997).

[45] *Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826, 859 (E.D. Tex. 2017) (sanctions under inherent power were warranted against non-party for improper conduct because the non-party "has an interest in the outcome of this litigation and substantially participated in these proceedings").

[46] *Id.* at 858 (quoting *Helmac Prod. Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563, 568 (E.D. Mich. 1993)).

-11-

litigation.[47] In addition to the remedies under Rule 11, this Court should sanction Plaintiff *and* Helms for abuse of the litigation process, as Helms is sufficiently entwined in this case.

**B.    Plaintiff Asserted Wholly Unsubstantiated Claims**

First, Plaintiff's claims that Aetna owes Victory more money are groundless. Plaintiff relied on Helms's analysis of what was allegedly owed for the allegations in his pleadings,[48] and Helms testified that he believed an analysis was done by his Torch team, namely, Kelly Russell ("Russell").[49] Clearly, no one did any sort of analysis *under the terms of the plans because Plaintiff could not answer that question in discovery until he hired an expert*, and when he did produce an expert report, it had nothing to do with Plaintiff's Complaint.

Plaintiff's Complaint *alleged* that Aetna underpaid Victory's claims for two "primary" reasons: (1) Aetna paid "nearly every claim" at 140% of the Medicare rate in violation of the plans; and (2) Aetna failed to correctly calculate the Medicare allowable.[50] Plaintiff produced absolutely *no evidence* of these allegations nor any new "theory" until serving his expert report (of Rodney Sowards). Based on Sowards' report, the vast majority of Plaintiff's alleged damages (over $20 million) do not even purport to be based on plan terms at all. Instead, Plaintiff just picked a percentage of the billed charges (e.g., 64%) paid on other claims that Helms/Russell found to be "acceptable."[51] This "acceptable rate" theory lacks any basis in law.

---

[47]    *Id.* (citing *Manez v. Bridgestone Firestone N. Am. Tire, LLC,* 533 F.3d 578, 585 (7th Cir. 2008) and *Bartos v. Pa.*, No. 1:08-CV-0366, 2010 WL 1816674, at *5 (M.D. Pa. May 5, 2010)).

[48]    Ex. 2, Gilmour Dep., at 23:20-25:10; Ex. 1, Helms Dep., at 289:06-13.

[49]    Victory's former Revenue Cycle Director. Ex. 1, Helms Dep., at 287:04-18.

[50]    Complaint at ¶ 44.

[51]    *See* Ex. 22, Excerpts of Responsive Report of K. Cornish at pp. 29-30. Plaintiff (presumably through Torch) provided his expert claims data that he represented as being submitted by the facilities at issue to try to find an "acceptable" rate. After researching the claims, Aetna

-12-

Moreover, pre-bankruptcy, Victory performed a review of all patient accounts.[52] Not surprisingly, many of the accounts at issue *were written off as not collectible*.[53] Yet, Plaintiff now claims an expectation of 64% of billed charges for all these accounts. Tellingly, Plaintiff has tried to hide all *post*-bankruptcy collection analyses.[54] For example, Plaintiff hired Donna Enciu ("Enciu")–Victory's former Vice President of Revenue Cycle–to assist Plaintiff with some type of collection evaluation, but she claimed *not to remember a single thing about it*.[55]

In the end, there is no legitimate basis for Victory's claimed expectation of 64% of billed charges,[56] especially since what had been paid previously was the result of excessive charges and based on fraud.[57] Pursuing groundless pleadings alone is sanctionable.[58]

## C.   Plaintiff Is Effectively Perpetuating Victory's Healthcare Fraud

At this point, Plaintiff knows about Victory's fraudulent schemes and is effectively aiding and abetting Helms in pursuing fraudulent healthcare claims against Aetna. Specifically, Plaintiff testified that he would read Hillman's testimony, which describes Helms' illicit

---

realized they were actually submitted by a *different* facility (i.e., one not at issue). Notably, Aetna incurred considerable costs in investigating the "mislabeled" claims.

[52]   Ex. 23, Dep. Ex. 144.

[53]   *See, e.g.*, Ex. 13, Russell Dep., at 167:20-168:02 & Ex. 24, Dep. Ex. 55.

[54]   Aetna asked for the analysis of the accounts receivable as part of the investigation into assets of the Estate, but Plaintiff refused to disclose it based on privilege. Ex. 1, at 302:16-305:18.

[55]   Ex. 25, Sept. 18, 2019 Dep.,Tr., Donna M. Enciu ("Enciu Dep.") at 134:20-137:25.

[56]   While at least referencing plan terms, Plaintiff's other category of damages likewise is without merit as set forth in Aetna's motion for summary judgment.

[57]   *See Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1146 n.3 (9th Cir. 2002) (fraud and estoppel are available to plan administrators against employees seeking benefits); *see also Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985) (claimant's unclean hands barred relief); *Bigelow v. United Healthcare of Miss., Inc.*, 220 F.3d 339, 341 (5th Cir. 2000) (denying equitable relief to plaintiff with unclean hands).

[58]   *See Worrell v. Houston Can! Acad.*, 287 F. App'x 320, 326-27 (5th Cir. 2008).

-13-

schemes to recruit surgeons to perform cases at Victory.[59] Moreover, Victory's own documents and data corroborate Hillman's testimony, which Plaintiff surely knows since he sought to hide those documents initially.[60] Even Helms acknowledged in deposition that another employee at Victory testified that the same marketing schemes at Forest Park occurred at Victory.[61]

Astonishingly, in his deposition, Plaintiff suggested Victory's fraudulent (*and illegal*) conduct did not affect Aetna.[62] Obviously, it did. Victory's schemes drove up Aetna's out-of-network payments, which were often paid based on billed charges, or a percentage thereof.[63] As Aetna's expert in hospital billing, Marc Chapman, explains, Victory's physician kickback and implant schemes unreasonably and inappropriately inflated Victory's billed charges.[64]

Furthermore, Victory induced Aetna to pay non-covered claims. Dr. Samir Awad and Dr. William Granberry (both Baylor College of Medicine) and Dr. Robert Jackson (Houston Methodist Hospital) have described Victory's reporting of services not rendered, overcharging

---

[59] Hillman admitted to paying physicians for marketing and medical directorships for cases at Victory, explaining that Victory's "marketing companies" were the vehicles for the (illegal) physician kickbacks. Hillman further testified that surgeons who owned interests in implant distributorships (as middlemen) sold implants to Victory at an exorbitant markup in exchange for performing surgeries at Victory's facilities. As importantly, Hillman testified Helms "was ultimately in control of the entire system" and even negotiated the implant deal with Dr. Won. *See* Ex. 6, *USA v. Beauchamp, et al.*; Case No. 3:16-cr-00516-JJZ, Tr. Vol. 9 at 209:20-21; 220:02-11.

[60] This includes, *inter alia*: (1) the same marketing agreement with Primedia that Hillman described; and (2) Victory's payments to physicians routed through Hillman, including $250k in monthly payments to Dr. Won. It also includes waiver of the patient's financial responsibility under the plan. Victory usually collected nothing from the members, and after three "invoices" their "debt" was written off. *See* Ex. 26, V0088233. Under Texas law, a provider cannot waive a deductible or copayment by the acceptance of an assignment. Tex. Ins. Code Ann. § 1204.055(b).

[61] Ex. 1, Helms Dep., at 26:20-27:11.

[62] Ex. 2, Gilmour Dep., at 154:21-155:10, 157:11-158:8.

[63] Ex. 27, V0051196.

[64] Ex. 28, Report of Marc Chapman, p. 2.

-14-

for implants, and performing excessive procedures.[65] A coding compliance expert, Georgeann Edford, found similar patterns.[66] Plaintiff has not responded to any of these findings.

As if all of this were not enough to show the reckless pursuit of frivolous claims, Plaintiff seeks significant amounts for implant charges, which included gross mark-ups significantly above retail based on physician kickbacks.[67] For example, Jim Hermes, Victory's former CFO, testified that surgeons charged Victory for "very expensive" biologic ointments (e.g., "BioD" or "AmnioFix"),[68] which were "absolutely *un*essential for the care and healing of the patient"[69] but nevertheless were billed to Aetna. Furthermore, when Aetna questioned Victory about these products during the SIU investigation, ***Victory told Aetna that it had stopped billing Aetna for them***.[70] Now Plaintiff seeks payment for those very products here.

The evidence also establishes that while Victory was trying to negotiate the removal of Aetna's SIU flag, Victory told Aetna ███████████████████████████████████ ███████████████████████████.[71] In mid-February 2014, however, Victory raised its chargemaster again and then ***rebilled*** for services at the ***higher rate***.[72] In deposition, Plaintiff's witness had to acknowledge that Victory was worried that rebilling at the higher charges would

---

[65]   Ex. 29, Report of Dr. Samir Awad, at pp. 8-9; Ex. 30, Excerpts of Report of Dr. William Granberry, at p. 3; & Ex. 31, Excerpts of Report of Dr. Robert Jackson, at p. 17.

[66]   Ex. 32, Excerpts of Report of Georgeann Edford, pp. 23-24.

[67]   Ex. 15, at A0315917.

[68]   Ex. 10, Hermes Dep., at 128:08-129:25.

[69]   Ex. 10, Hermes Dep., at 130:01-08.

[70]   *See, e.g.,* Ex. 19, at A0263412-13 (representations made to Aetna on behalf of Victory about Victory no longer billing the "E&I" connective tissue).

[71]   *See, e.g.,* Ex. 33, V0093126 (email from Naya Kehayes to Susan Lee dated January 29, 2014); Ex. 19, at A0263420-21 (Aetna's contemporaneous records of the email).

[72]   Ex. 25, Enciu Dep., at 110:03-118:05; Ex. 34, Dep. Ex. 139.

-15-

raise "red flags" and "risk" its relationship with Aetna.[73] Yet, Victory did so anyway, and Plaintiff has the audacity to seek to recover on the ***higher*** billed charges in this suit.

After Aetna served its motion for sanctions, not only did Plaintiff refuse to dismiss this case, he filed a motion for summary judgment asserting there was no evidence of fraud to support Aetna's claims, making several frivolous allegations as follows (as mere examples):

1.  "Payments were not made to physicians for any other reasons than their partnership distributions or medical directorships."[74]

    - Plaintiff's corporate representative on Victory's "relationships with physicians" testified that Victory did *not have* medical directors.[75] Hillman explains these payments were for referrals.[76]

    - When Aetna asked Plaintiff's corporate representative about "agreements" and "deals" with physicians in Victory's records, he was entirely unprepared.[77] Plaintiff wagered that it was better not to educate his corporate representative than answer the truth.

2.  "Aetna has provided no evidence . . . that Victory's charges exceeded what most facilities billed for the same services by 300% to 400%."[78]

    - Aetna answered this interrogatory by incorporating its expert reports. Notably, Aetna's expert pointed out evidence of such overcharging (300-400% more) *in Victory's own files*.[79]

As such, Plaintiff's motion further evidences their bad faith pursuit of this baseless lawsuit and unnecessarily forces Aetna to respond to a 45-page, largely no-evidence motion.

---

[73] Ex. 25, Enciu Dep. at 202:04-204:19.

[74] Defendants' Motion for Partial Summary Judgment, Dkt. 92, p. 3.

[75] Ex. 38, Gabriel II Dep., 70:16-21; Ex. 10 (Hermes Dep., 225:5-7).

[76] Ex. 38, Gabriel II Dep., 130:24-131:17.

[77] *See, e.g.*, Ex. 38 Gabriel II Dep. 99:18-100:8 (unable to answer questions about ██████ agreement); 89:7-90:25 (unable to answer questions about ██████ deal).

[78] Dkt. 92, p. 13.

[79] Ex. 32, at p. 9 of 24 (comparing charges at Victory San Antonio to other facilities).

-16-

To recap, regardless of the legalities of Victory's actions—and make no mistake that Aetna views them as illegal, as did a jury when considering similar facts—the evidence of Victory's fraud bars Plaintiff's claims. Continued pursuit of Plaintiff's claims while attempting to hide the facts is simply furthering the fraud itself and in violation of Rule 11.

**D.      Plaintiff and Helms Are Pursuing This Case In Bad Faith**

Continued pursuit of these claims can only be considered as bad faith and willful misconduct. Plaintiff acknowledged at his deposition that he had not investigated whether Victory engaged in any type of fraud.[80] In case there is any legitimate doubt (*and there should not be*), Aetna has exemplified herein how Victory's fraud does affect everything at issue.

Perhaps most indicative of bad faith, Helms—who orchestrated a scam that robbed the healthcare industry of hundreds of millions of dollars—is the driving force of this litigation.[81] While Helms may (unbelievably) have certain rights under the Chapter 11 bankruptcy plan, he does not have the right to force Plaintiff to pursue improper claims at the expense of the rights of litigants (Aetna) to be protected from the bad faith prosecution of claims. Indeed, Plaintiff has obligations to investigate these allegations as part of his fiduciary duties to the Grantor Trusts and creditors (including Aetna), and as a litigant in this case.[82]

---

[80]   Ex. 2, Gilmour Dep., at 94:09-19. When asked "is your view that a little bit of fraud would be okay and you could keep prosecuting your lawsuit – even if Aetna was defrauded," Plaintiff stated *it depends* on: (1) "whether the fraud relates to the claims [Victory is] making;" (2) "what the frauds you're talking about are;" and (3) "who knew what, when, where and how Aetna paid Victory for the services." Ex. 2, Gilmour Dep., at 154:21-155:10, 157:11-158:8.

[81]   *See* Ex. 2, Gilmour Dep., at 146:20-147:01.

[82]   Given these facts, Plaintiff's own conduct constitutes constructive fraud. *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 810 (5th Cir. 2017); *Klein v. Sporting Goods, Inc.*, 772 S.W.2d 173, 175 (Tex. App.—Houston [14th Dist.] 1989, writ denied).

-17-

**E.      Helms Has Obstructed These Proceedings In Bad Faith**

Helms, meanwhile, created Torch to perform collections on behalf of the Grantor Trusts for these (unsupported) accounts receivable, in order to receive payments for the fruits of his fraud as a secured creditor and as a principal of Torch.[83] Then, as Aetna was beginning to discover the truth about Victory's operations, Helms disrupted the proceedings through his criminal attorney. Helms' option to avoid criminal exposure based on testimony in this case is to *dismiss this case against Aetna*. Instead, he wants to have it both ways.

Indeed, Helms is obviously concerned about potential criminal liability. That was made clear the moment he retained Michael Wynne ("Wynne"), a criminal defense attorney, to attend the depositions of other witnesses, such as Shannon Osteen, Victory's former CFO and Vice-President of Finance, in mid-July. Aetna was forced to move for a protective order to prevent his unnecessary attendance. (Dkt. 78) Four of the witnesses who have been deposed since August have been represented by either Wynne *and*/or his partner, John Kinchen ("Kinchen"). It is clear that Helms has orchestrated these representations for his own ends.

For instance, Enciu testified that after she received Aetna's subpoena, she was contacted by Korri Bryant ("Bryant")–in-house counsel for Helms' Torch Recovery–to hire Kinchen.[84] Osteen testified similarly.[85] Furthermore, Bryant (no doubt at Helms's instruction) assisted with the preparation of witnesses for their depositions. Kinchen even instructed Enciu not to answer questions about her conversations with Bryant, citing "the attorney-client and

---

[83]   Ex. 2, Gilmour Dep., at 10:14-23, 158:16-161:08.

[84]   Ex. 25, Enciu Dep., at 13:01-14:17.

[85]   Ex. 9, Osteen Dep., at 23:21-24.

-18-

common interest privileges," even though Bryant does not represent Enciu. Other efforts to obstruct discovery include:

a.   Wynne insisted that Plaintiff "shut down" the initial deposition of Osteen, when Aetna's counsel objected to his attendance.

b.   Wynne objected "form" extensively during the deposition of Helms (365 times), and instructed Helms not to answer questions without a basis.

c.   Kinchen objected "form" extensively during the deposition of Osteen (324 times), and instructed Enciu not to answer without a basis.

Most significantly, every one of the witnesses represented by Wynne and Kinchen conveniently professed a complete lack of knowledge regarding the business operations for which they were directly responsible at Victory. The most egregious example is Enciu, who claimed to remember virtually nothing about Victory.[86] Even an email, wherein she wrote "[a]fter thinking and rethinking of this most of the night," could not refresh her recollection.[87]

In 2010, Helms hired Osteen as a consultant to determine the "collectability of accounts receivable" during the relevant time period. Despite extensive questioning, Osteen refused to explain how he made these "determinations" regarding collectability for commercial plans and could only "recall" any specifics regarding workers' compensation claims.[88] Osteen's coaching is further illustrated by his refusal to acknowledge or recall any matters that concerned Victory's financial health.[89] Additionally, Victory's corporate representative testified that Osteen approved implant payments,[90] but when asked in deposition, Osteen

---

[86]   Ex. 25, Enciu Dep., at 188:09-191:13.

[87]   Ex. 25, Enciu Dep., at 110:12-115:20.

[88]   Ex. 9, Osteen Dep., at 87:5-98:25.

[89]   Ex. 9, Osteen Dep., at 124:22-126:18.

[90]   Ex. 4, Gabriel Dep., at 119:9-120:12.

-19-

claimed to know or recall nothing about implant purchases.[91]

Helms has, at a minimum, instructed other witnesses to retain his criminal counsel and had his in-house lawyer at Torch Recovery participate in the deposition preparation of these witnesses for his own personal protection. His conduct in attempting to frustrate Aetna's ability to obtain complete and accurate testimony from former Victory's former executives is yet another abuse of this process.[92] Helms should be sanctioned, too.

## IV.        CONCLUSION & PRAYER FOR RELIEF

Once a court determines that sanctions are warranted, it may strike a party's pleadings and/or award to the prevailing party the reasonable expenses, including attorney's fees, and has significant discretion to determine other appropriate sanctions that suffice to deter repetition of the conduct or comparable conduct. FED. R. CIV. P. 11(c). The Court also may issue sanctions against interested non-parties in its discretion. Aetna respectfully requests that the Court enter appropriate sanctions here, including dismissing all of Plaintiff's claims, and ordering Plaintiff and Helms to pay Aetna's attorneys' fees and costs in this case.[93] Aetna also requests such other and further relief as the Court in its discretion deems appropriate.

---

[91]   Ex. 9, Osteen Dep.,at 143:25-149:16, 151:3-152:17.

[92]   *See, e.g., Howell v. Standard Motor Prods., Inc.,* No. 4:99-CV-987-E, 2001 WL 456241, at *4 (N.D. Tex. Apr. 27, 2001) (sanctions imposed under court's inherent power where attorney refused to let deponent answer numerous questions and ultimately suspended deposition).

[93]   *See TXCAT v. Phoenix Grp. Metals, LLC,* No. H-10-0344, 2010 WL 5186824, at *7 (S.D. Tex. Dec. 14, 2010) (Harmon, J.) (finding monetary sanctions in the form of fees and expenses incurred by the defendants in preparing and filing a reply and motion for sanctions should be imposed due to the Rule 11 violation); *see also Jordaan v. Hall,* 275 F. Supp. 2d 778, 791 (N.D. Tex. 2003) (in ordering Rule 11 sanctions, a court should take into account: (1) the specific conduct giving rise to the sanctions order; (2) the expenses or costs caused by violation of the rule; (3) whether or not the costs or expenses were reasonable, as opposed to self-imposed, mitigatable, or the result of delay in seeking court intervention; and (4) whether or not the sanctions imposed are the least severe sanction adequate to achieve the purposes of Rule 11).

-20-

OF COUNSEL:                                   Respectfully submitted,
HUNTON ANDREWS KURTH LLP
     and                                      By: */s/ John B. Shely*
M. KATHERINE STRAHAN                          JOHN B. SHELY
Texas Bar No. 24013584                        Texas Bar No. 18215300
*kstrahan@huntonak.com*                       HUNTON ANDREWS KURTH LLP
                                              600 Travis, Suite 4200
                                              Houston, Texas 77002
                                              Telephone: (713) 220-4200
                                              Facsimile:  (713) 220-4285
                                              *jshely@huntonak.com*

                                              ATTORNEY-IN-CHARGE FOR
                                              DEFENDANTS AETNA HEALTH INC.,
                                              AETNA HEALTH INSURANCE
                                              COMPANY, AND AETNA LIFE
                                              INSURANCE COMPANY

## CERTIFICATE OF CONFERENCE

I certify that on October 8, 2019, Defendants served a draft of this motion for sanctions on counsel of record for Plaintiff, and counsel of record for Robert N. Helms, Jr., who has appeared in this action, along with a correspondence inviting a discussion. I did not hear back. On October 15, 2019, I further conferred with Jennifer Ecklund, counsel for Plaintiff, by telephone concerning the relief requested herein, and on December 2, 2019, I conferred again by telephone with Andrew Cookingham, counsel for Plaintiff. Respondents are opposed to this motion.

/s/ M. Katherine Strahan
M. Katherine Strahan

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2019, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, Western District of Texas, using the CM/ECF system. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who are known "Filing Users:"

Jennifer Rudenick Ecklund
*Jennifer.Ecklund@tklaw.com*
Andrew Cookingham
*Andrew.Cookingham@tklaw.com*
Reed C. Randel
*Reed.Randel@tklaw.com*

Michael J. Wynne
*mwynne@hakllp.com*

/s/ John B. Shely
John B. Shely

011168.0268748 HOU 3963554v1