**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| NEIL GILMOUR, III, TRUSTEE FOR THE GRANTOR TRUSTS OF VICTORY PARENT COMPANY, LLC, VICTORY MEDICAL CENTER CRAIG RANCH, LP, VICTORY MEDICAL CENTER LANDMARK, LP, VICTORY MEDICAL CENTER MID-CITIES, LP, VICTORY MEDICAL CENTER PLANO, LP, VICTORY MEDICAL CENTER SOUTHCROSS, LP, VICTORY SURGICAL HOSPITAL EAST HOUSTON, LP, AND VICTORY MEDICAL CENTER BEAUMONT, LP, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 5:17-CV-00510-FB |
| Plaintiffs, | §<br>§<br>§ | |
| v. | §<br>§ | |
| AETNA HEALTH INC., AETNA HEALTH INSURANCE COMPANY, AND AETNA LIFE INSURANCE COMPANY, | §<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§<br>§ | |

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

OF COUNSEL:
HUNTON ANDREWS KURTH LLP
   and
M. KATHERINE STRAHAN
State Bar No. 24013584
*kstrahan@huntonak.com*
ALLISON A. SJOBERG
State Bar No. 24089622
*asjoberg@huntonak.com*

JOHN B. SHELY
State Bar No. 18215300
600 Travis Street, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4105
Telecopier: (713) 220-4285
*jshely@huntonak.com*

ATTORNEY-IN-CHARGE FOR DEFENDANTS
AETNA HEALTH INC., AETNA HEALTH
INSURANCE COMPANY, AND AETNA LIFE
INSURANCE COMPANY

Defendants Aetna Health Inc., Aetna Health Insurance Company, and Aetna Life Insurance Company ("*Aetna*") respond to the Objections to Report and Recommendation of Magistrate Judge filed by Plaintiffs Neil Gilmour, III, Trustee for the Grantor Trusts of Victory Parent Company, LLC, Victory Medical Center Craig Ranch, LP, Victory Medical Center Landmark, LP, Victory Medical Center Mid-Cities, LP, Victory Medical Center Plano, LP, Victory Medical Center Southcross, LP, Victory Surgical Hospital East Houston, LP, and Victory Medical Center Beaumont, LP ("*Victory*").

## I. INTRODUCTION

Victory's objections to the United States Magistrate Judge's recommendations that Aetna's motion for summary judgment be granted and that the testimony of Victory's expert on the question of liability be excluded are premised on nothing more than (1) the flawed argument that liability and damages are synonymous, and (2) mischaracterizations of witness testimony. As outlined in the Report and Recommendation, the Magistrate Judge examined the record, including the same allegations about the witness testimony, and found that Victory's claims lack sufficient evidence to survive summary judgment. Indeed, Aetna is entitled to summary judgment because Victory failed to show that a factfinder could conclude that Victory is owed additional amounts under the health plans at issue.

Significantly, Victory failed to demonstrate to the Court how Aetna actually underpaid even one exemplar claim in response to Aetna's summary judgment motion. Realizing that it had no evidence of liability, Victory tried to bootstrap the flawed damage model of its damages expert into evidence that Aetna breached the terms of the plans. But, correctly so, the Recommendation finds that such expert testimony on *liability* should be

excluded. Based simply on limited "word searches" in the plans and a methodology dictated by Victory itself, the opinions of Victory's expert about alleged underpayments are unreliable and inadmissible on the ultimate question of liability.

This case has been nothing but a money-grab from the beginning—on medical claims that Aetna contends, not incidentally, are tainted by fraud. Summary judgment proceedings exposed the groundlessness of Victory's claims, and Victory's Objections fail to show any error made by the Magistrate Judge. The Recommendation should be adopted.

## II. RESPONSE TO OBJECTIONS

### A.    Victory's Retained Expert Should Not Be Allowed To Testify On Liability.

Victory designated Rodney Sowards as a retained damages expert, and Aetna moved to exclude his opinions because they did not meet the standards for admissibility under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).[1] The Recommendation does not reach the issue of whether Sowards' opinions are sufficiently reliable on *damages* but finds that they are unreliable on Aetna's *liability* and cannot be used to raise a fact issue on Aetna's summary judgment motion.[2] The Recommendation's finding are correct, and Victory's objections are without merit.[3]

---

[1] *See* Aetna's Opposed Motion to Exclude the Opinions of Plaintiff's Damages Expert, Rodney Sowards ("Sowards Motion"), DKT# 103.

[2] As the Recommendation states, the party offering an expert's opinion has the burden of establishing, by a preponderance of the evidence, its evidentiary reliability or trustworthiness. DKT# 160, at 8-9 (citing *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998)).

[3] Victory is entitled to a *de novo* determination **only** as to those matters for which a specific written objection has been filed.  FED. R. CIV. P. 72(b).

**1.     The Recommendation correctly finds Sowards' opinions are unreliable.**

As the Recommendation notes, Sowards divided the alleged underpayments on Victory's claims for facility fees in this case (the "disputed claims") into two categories: (1) those that fall under what Sowards calls "reasonable and customary" ("R&C") plans,[4] and (2) those that fall under what he calls "FAIR Health" plans.[5] Recommendation, DKT# 160, p. 9 at n.2. His opinions regarding both categories are equally unreliable.

**a.     Sowards' R&C methodology is unreliable.**

The most fundamental flaw in Sowards' R&C analysis is summed up by a single line in his report: "Veritas [Sowards' company] utilized historical information from Aetna claims that were paid at a negotiated rate or at a level acceptable to Victory as the basis for determining the [amount that should have been paid on the disputed claims]."[6] Sowards simply calculated the paid-to-billed charge ratio on these "undisputed" claims ("historical" is a misnomer[7]) to derive a paid rate of 64% of Victory's billed charges. He then applied

---

[4] Purportedly, each of the R&C plans contains language requiring reimbursement at the "reasonable and customary" level, but Sowards admitted the R&C category includes plans that have completely different methods for calculating out-of-network reimbursement rates, including those with fee schedules, and those which do not use the term "reasonable and customary" at all. *See, e.g.,* Sowards' Deposition Transcript ("Sowards Dep.") (DKT# 103-2) at 105-09.

[5] The "FAIR Health" plans supposedly required Aetna to pay Victory's claims at a rate obtained from FAIR Health, a third party. *See* Sowards Report (DKT# 103-3) at 7-8. Sowards grouped into this category any plan in which the term "FAIR Health" appeared in the plan document, regardless of whether the plan actually required claims for facility fees (as opposed to professional fees) to be paid based on Fair Health data. Sowards Dep. (DKT# 103-2) at 99-101.

[6] *See* Expert Report of Sowards ("Sowards Rep.") (DKT# 103-3) at 10 (emphasis added).

[7] The term "historical" is inaccurate because it suggests that all of the "undisputed" claims were from a prior period of time, which is not the case.

3

the 64% rate to the disputed claims to calculate Victory's alleged damages.[8] Importantly, Sowards admitted that he did ***not* consider any plan language for any of the undisputed claims**. ***Nor did he consider any information about the claims which would have affected the level of reimbursement, such as the types of services.*** He did nothing to draw any comparisons or similarities between the disputed and undisputed claims.

<blockquote>

i.     **Victory, not Sowards, determined which claims were underpaid.**

</blockquote>

While the flaws in Sowards' R&C methodology are numerous, one in particular stood out to the Magistrate Judge: the universe of claims Sowards used to establish his 64% "benchmark" ***were selected solely by Victory***, and included only those claims that Victory chose not to dispute in this lawsuit because it was "satisfied" with the level of reimbursement.[9] All other claims submitted during the relevant time period (those for which Victory was not satisfied with the level of reimbursement) were completely disregarded.[10]  There could be no clearer evidence of bias in Sowards' analysis.[11]

As the Recommendation correctly recognizes, Sowards' methodology assumed the

---

[8] Sowards Rep. (DKT# 103-3) at 11-14 and Table 7.

[9] Sowards Dep. (DKT# 103-2) at 150.

[10] *See* Sowards Dep. (DKT# 103-2) at 150 (Sowards admitting that the claims he used to establish his benchmark were those "allowed or paid at a level that was consistent with what *Victory* thought should have been paid on those [claims]" (emphasis added); *id.* at 167 (Sowards admitting he had no idea how Victory selected the claims used to set the benchmark, and stating that he merely "accepted [Victory's] representation of undisputed claims").

[11] Expert opinions must be "based on sufficient facts or data," and the "product of reliable principles and methods." FED. R. EVID. 702.  If the opinion is based upon an unreliable foundation, it must be excluded. *Daubert,* 509 U.S. at 597. *See also United States v. Posado,* 57 F.3d 428, 433 (5th Cir. 1995) (evidentiary reliability requires that testimony be "more than speculative belief or unsupported speculation" and based on "good grounds").

Case 5:17-cv-00510-FB   Document 169   Filed 08/10/20   Page 6 of 25
disputed claims had been underpaid before he even began his analysis. Even more problematic, he accepted Victory's determination of which claims had been paid at an "acceptable" level—and which claims had been underpaid—without question or further evaluation.[12]  Sowards' opinions cannot possibly be used to establish Aetna's liability when he assumed liability existed and then calculated damages accordingly. The Recommendation appropriately rejects this "circular reasoning," and correctly finds that Sowards' opinions are not reliable evidence of Aetna's liability under ERISA.[13]

While Victory points to case law that it contends supports a "benchmarking" or "sampling" approach, not a single case cited by Victory supports Sowards' methodology. First and foremost, none of Victory's cases analyzed the relevance of benchmarking or sampling to the question of what is payable for covered services *under the terms of employee benefit plans*.[14] Rather, all of Victory's cited cases arise in a different context.

Nor can Victory rely upon cases that approve the use of "statistical sampling" because inferential statistics are only useful when the sample utilized is fairly

---

[12] It is well established that expert opinions are not reliable when they "rest on [a party's] say-so rather than a statistical analysis." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 420 (7th Cir. 2005); *see also Iconics, Inc. v. Massaro,* 266 F. Supp. 3d 461, 469 (D. Mass. 2017) ("An expert is responsible for ensuring that his opinion is based on reliable data; he may not blindly rely on his client's representations"); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.,* 188 F.3d 11, 25 (1st Cir. 1999) (expert must "vouchsafe the reliability of the data on which he relies and explain how . . . that data was consistent with standards of the expert's profession").

[13] Recommendation (DKT# 160) at 8-10.

[14] *See, e.g., Children's Hosp. Cent. Cal. v. Blue Cross of Cal.,* 172 Cal. Rptr. 3d 861 (Cal. Ct. App. 2014) (addressing relevance of certain data to determine the reasonable value of services *under an implied-in-fact* contract theory); *In re N. Cypress Med. Ctr. Operating Co.,* 559 S.W.3d 128 (Tex. 2018) (addressing relevance of certain data in determining reasonable value of hospital services *under a lien in a personal injury dispute*).

representative of the whole.[15] Here, the universe of claims used to set the purported benchmark—selected by Victory and accepted by Sowards without further analysis—is not even representative of Aetna's payment levels over the course of the parties' relationship, let alone representative of the amounts Victory may have received from other payors or any other "relevant" factors considered to determine "reasonable charges" in the cases that Victory cites.[16] Furthermore, when conclusions regarding a "sample" set are extrapolated to the universe of claims as a whole, at least some analysis must be conducted to examine the details, e.g., actual underpayments, of the sample claims.[17] Sowards undertook no such analysis here. Thus, sampling and extrapolation do not even come into play here at all.[18]

ii.   **Sowards failed to consider terms of the applicable health benefit plans or the processing of the claims at issue.**

Additionally, Victory has never disputed that in applying his R&C methodology,

---

[15] Victory's cited cases recognize this limitation. *See, e.g., United States v. Robinson,* No. 13-cv-27-GFVT, 2015 WL 1479396, at *10 (E.D. Ky. Mar. 31, 2015) (when statistical sampling is used, "[t]he sample employed must be fairly representative and statistically valid).

[16] In *Children's Hospital*, the court noted that a "wide variety of evidence" is used to calculate the reasonable value of medical services, such as rates paid by other payors and hospital's costs. 172 Cal. Rptr. at 872. Sowards considered none of that here. The court also specifically rejected the proposition that value could be set based upon "what the provider unilaterally says its services are worth," which was the entire basis for Sowards' purported benchmarking. *Id.* at 873.

[17] *See, e.g., United States v. Robinson*, No. 13-CV-27-GFVT, 2015 WL 1479396, at *10 (E.D. Ky. March 31, 2015) (expert analyzed 30 claims individually to determine amount of overpayments, then extrapolated amount of damages to broader universe of claims); *State of Ga. v. Califano,* 446 F. Supp. 404, 406-07 (N.D. Ga. 1977) (administrator audited certain claims to determine overpayments, and projected total overpayments based upon those samples).

[18] Victory also alleges that the undisputed or benchmark set includes claims "for which Aetna ultimately paid Victory nothing." But those "zero-payment" claims represent less than 1% of the total billed charges in the benchmark universe. Attachment G to the Sowards Report reveals that the billed charges on claims with zero payment were $1,484,368.85, or .905 percent of the total billed charges in the benchmark universe.

Sowards did not consider: (i) all of the terms of the applicable health benefit plans, or (ii) the specific information associated with the claims at issue.[19] In deposition, for example, Sowards testified that his associates performed only a "word search" in plan documents for certain terms.[20] He also admitted that he did not read or find relevant deposition testimony explaining that Aetna's reimbursement methodologies under the plans changed over time.[21] Additionally, the claims at issue involve a variety of different services, which affects applicable reimbursement methodologies under the plans.[22] Any attempt to calculate a "historical" payment level without considering these critical differences is inherently unreliable. This is yet another reason to exclude those opinions.

      **b.**    **Sowards' FAIR Health methodology was unreliable.**

Contrary to what Victory argues, the Recommendation does not ignore Sowards' analysis of the so-called FAIR Health claims, and any "lump[ing]" of those claims with the R&C universe was a result of Sowards' chosen methodology, not any error in the Magistrate Judge's analysis. The Recommendation specifically recognizes Sowards' application of the FAIR Health methodology, though it correctly notes that the R&C claims

---

[19] *See, e.g.,* DKT# 103 at 8-12; DKT# 138 at 3-5. For example, Sowards failed to consider reimbursement factors listed in the plans at issue, such as fee schedules referenced in certain plans or Aetna's policies referenced in the plans. Sowards also failed to consider any information associated with specific claims, including the type of service (i.e., observation, pain management, bariatric procedures, or spinal surgeries), the date of service, and whether treatment was inpatient or outpatient—all of which affect the level of reimbursement. Incredibly, Sowards did not even know, at the time of his deposition, what kind of services Victory provided. *See* Sowards Dep. (DKT# 103-2) at 59-65. His lack of knowledge underscores the flaws in his opinions.

[20] DKT# 103-2 at 100-03.

[21] DKT# 103-2 at 103.

[22] *See, e.g.,* Aetna's Reply in Support of the Sowards Motion (DKT# 138) at 4-5.

made up the majority of the claims at issue.[23] The Recommendation also recognizes that Sowards applied his flawed R&C analysis to any disputed FAIR Health claims for which no geographic-specific data was available, rendering his analysis with respect to the majority of those claims just as unreliable as his R&C methodology.[24] Coupled with the Magistrate Judge's determination that Sowards had not purported to opine on the issue of Aetna's liability on ***any*** of the claims at issue, as discussed below,[25] the Recommendation sufficiently considered Sowards' FAIR Health analysis and made a reasoned determination that the analysis could not be used as evidence of Aetna's liability. In any event, Aetna put forth sufficient evidence to establish the flaws in Sowards' FAIR Health methodology.

Aetna's challenge to Sowards' FAIR Health opinions–which spanned 6 pages of Aetna's Sowards Motion and cited extensively to relevant case law and portions of the record–cannot fairly be characterized as "marginal."[26] In sum, Sowards' FAIR Health methodology was unreliable because: (1) FAIR Health does not apply to the facility claims at issue (and any determination to the contrary would require an impermissible interpretation of plan terms); (2) Sowards, by his own admission, did not consider any other factors that could have affected the out-of-network reimbursement rate for Victory's facility claims; and (3) Sowards calculated damages on most of the "FAIR Health" claims

---

[23] *See* Recommendation (DKT# 160) at 9, n.2 (specifically recognizing FAIR Health set of claims); *id.* at 9 (noting that Sowards used his R&C "benchmark" universe to calculate damages on the majority of claims at issue, specifically including FAIR Health claims for which he did not have geographic-specific data).

[24] Recommendation (DKT# 160) at 9 (citing Sowards' Expert Report (DKT# 103-9) at 13-14).

[25] Recommendation (DKT# 160) at 7. *See* Section II.A.2., *infra*.

[26] *See* Sowards Motion (DKT# 103) at 14-19.

8

by applying the same 64% benchmark he used with the R&C claims.[27]

### i. In opining that FAIR Health should have been used to price the claims at issue, Sowards impermissibly interpreted plan terms.

None of the plans state that facility fees must be priced based on Fair Health data. In deposition, Sowards acknowledged that the plans allow Aetna much "latitude as to how they're going to price a claim," and that he had to "interpret" the plans to derive his underpayment methodology on the "FAIR Health" claims.[28] But that is something the law does not allow him to do. *See, e.g., Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (allowing expert to testify on ultimate issue "invades the court's province"); *Stallion Heavy Haulers, LP v. Lincoln Gen. Ins. Co.*, No. SA-09-CA-0317-FB, 2011 WL 130154, at *2 (W.D. Tex. Jan. 13, 2011) (excluding expert testimony that purported to interpret terms of insurance policy); *Halbach v. Great-West Life & Annuity Ins. Co.*, No. 4:05CV02399 ERW, 2007 WL 2108454, at *4 (E.D. Mo. July 18, 2007) (court refused to consider expert testimony regarding interpretation of ERISA plan).[29]

To the extent Sowards did not interpret plan language in applying his FAIR Health methodology, he would have had to assume that Aetna paid those claims incorrectly before calculating damages using the FAIR Health data. That approach would result in the very

---

[27] *Id.*

[28] Sowards Dep. (DKT# 103-2) at 76-77 & 137-139.

[29] The Court in *Halbach* relied upon the Eighth Circuit's decision in *Brewer v. Lincoln Nat'l Life Ins. Co.,* 921 F.2d 150, 154 (8th Cir. 1990). The Fifth Circuit has also cited *Brewer* with approval.  *See Lynd v. Reliance Standard Life Ins. Co.,* 94 F.3d 979, 983 (5th Cir. 1996); *See also Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. C-09-312, 2010 WL 4595592, at *4 (S.D. Tex. Nov. 1, 2010) ("federal courts have been clear that expert testimony is generally not permitted to interpret the terms of a contract or the legal effect of a contract").

same problem that rendered Sowards' R&C methodology unreliable on liability.[30]

### ii. Sowards did not consider the reimbursement policies and other terms limiting reimbursement in the so-called FAIR Health plans.

Sowards' FAIR Health analysis is also unreliable because, by his own admission, he did not consider any other factors (specifically enumerated in the plan documents) that could have affected the rate of reimbursement for Victory's facility claims, such as Aetna's reimbursement policies, the cost and complexity of a service, the number of procedures performed, and Aetna's Facility Charge Review policies.[31] For example, Sowards admitted that he ignored plan language that states that "Aetna may also reduce the recognized charge by applying Aetna Reimbursement Policies."[32] Despite this language in the plans, and despite Victory's allegation that "Aetna is required to pay claims . . . [as] set forth in the patient's benefit plan,"[33] Sowards never even requested, reviewed, or attempted to apply the Reimbursement Policies to the claims at issue. Blindly relying upon FAIR Health rates when the plan contains the words "FAIR Health"—while deliberately ignoring contrary reimbursement terms in the plan—does not constitute a reliable methodology.

---

[30] *See* Recommendation (DKT# 160) at 10 ("[t]he primary problem with [Sowards'] approach, especially as applied to the question of Aetna's liability, is that it rests on an assumption that certain claims were properly paid and others were underpaid without undertaking an independent analysis to determine the same").

[31] *See* Sowards Motion (DKT# 103) at 17-18. Sowards admitted that he did not consider any of these variables. *Id.* (citing Sowards Dep. (DKT# 103-2) at 111-12, 115-16).

[32] Sowards Dep. (DKT# 103-2) at 116; *see also* Sowards Motion (DKT# 103) at 17-19.

[33] Complaint (DKT# 1) ¶ 27.

### iii.     In reality, Sowards calculated damages on the majority of so-called FAIR Health claims using his arbitrary R&C methodology.

Finally, as the Recommendation recognizes, Sowards actually calculated damages on a substantial portion of the FAIR Health claims *by applying the same unsupported 64% benchmark he used with the R&C claims*—not payment data supplied by FAIR Health.[34] The number of FAIR Health claims Sowards actually priced using the R&C methodology was significant: 370 of the 419 so-called FAIR Health claims (more than 88 percent) have at least one line item for which Sowards could not identify FAIR Health data, resulting in the application of his arbitrary 64% reimbursement rate to those claims.[35] As the Recommendation undoubtedly recognizes when it states that the 64% benchmark was actually used to calculate damages "as to almost all of the 1,801 claims at issue,"[36] this methodology is equally unreliable when applied to the FAIR Health claims, and further supports the determination that Sowards' methodology is unreliable.

### 2.     The Recommendation correctly declines to consider Sowards' analysis as evidence of Aetna's alleged liability on summary judgment.

Victory designated Sowards as an expert to quantify Victory's damages—not Aetna's liability under ERISA or the plans. In fact, Sowards' own report unambiguously states that he was retained by Victory "to evaluate damages Victory allegedly suffered in connection with medical facility services provided to members of health plans administered

---

[34] *See* Recommendation (DKT# 160) at 9; Sowards Report (DKT# 103-3) at 8.

[35] *See* Rebuttal Report of Aetna's damages expert, Kevin Cornish (DKT# 103-4) at 37, ¶ 59.

[36] Recommendation (DKT# 160) at 9.

or insured by [Aetna]."[37] Nowhere in his report does Sowards purport to opine on Aetna's liability under ERISA, as the Recommendation recognizes.[38]  This alone is grounds for the Court to disregard any opinions Sowards purportedly offered with respect to Aetna's liability.  As the Recommendation aptly notes, "[w]hether Aetna misinterpreted or misapplied the plan terms (i.e., whether Aetna is liable to Victory) is a distinct question from how to calculate damages if Victory can prove Aetna did so."[39]

Nor should Victory be allowed to avoid summary judgment by retroactively recasting its damages expert as one offered to establish Aetna's liability. Even if Sowards *had* been designated to testify about Aetna's liability under ERISA (which he was not), the Recommendation correctly finds that Sowards' flawed methodology could not be used to establish Aetna's liability, in any event. This is true for a several reasons.

First, Sowards' methodology is inherently unreliable, for the reasons previously discussed. If that methodology was insufficient to support his damages calculation (as Aetna argued in the Sowards Motion), it certainly would be insufficient to create a fact issue regarding Aetna's liability.  In fact, Sowards' methodology is even more problematic with respect to the question of liability, *because Sowards admitted that it was* <u>*Victory*</u>*, not himself, that determined which claims were properly paid and which were underpaid*.[40]

---

[37] Sowards' Expert Report (DKT# 103-9) at 4.

[38] Recommendation (DKT# 160) at 7.

[39] *Id.*

[40] *See* Sowards Dep. (DKT# 103-2) at 149-50.

Second, Sowards' opinions regarding Victory's damages are ***not*** the equivalent of evidence of liability. Victory asserts that "[t]he difference between what Aetna paid and what it should have paid under the plans establishes both Aetna's breach of the plans and Victory's damages." Before it can be established that Victory has suffered any damages, however, Victory must establish that there <u>is</u> a difference between what Aetna paid and what it should have paid under the plans. In other words, Victory must establish that Aetna abused its discretion in making benefit determinations under the applicable ERISA plans,[41] and it would have been improper for Sowards to opine on such issues, as explained next.

Third, as the Recommendation suggests and as Aetna contended in its motion for summary judgment,[42] Victory cannot rely on expert testimony to establish a contested issue of fact in an ERISA case, where the court's review is limited to the administrative record. *See Vega v. Nat'l Life Ins. Servs.,* 188 F.3d 287, 300 (5th Cir. 1999), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008).[43] This is yet another reason Victory cannot rely on Sowards' report in response to Aetna's summary judgment motion.

---

[41] In his report, Sowards effectively admits that he has assumed Aetna's liability in reaching his conclusions. *See* DKT# 103-9 at 5 (describing his report as "address[ing] Veritas' evaluation of Victory's damages *as a result of Aetna's wrongdoing*") (emphasis added); *id.* at 8 ("Veritas has been asked to determine the amount, if any, of damages incurred by Victory *due to Aetna's alleged improper processing of claims in dispute*") (emphasis added). The Magistrate Judge specifically notes this in the Recommendation.  DKT# 160 at 7.

[42] DKT# 94 at 15, n.51.

[43] Victory argues that, in *Vega*, the Fifth Circuit indicated that expert testimony is allowed to help the court understand the claims and issues involved in case, but the *Vega* Court noted only a narrow exception for testimony to assist a court in understanding medical terms or practices relating to the underlying claims. *Vega*, 188 F.3d at 299. Victory offers impermissibly more. *See Soileau & Assoc., LLC v. La. Health Serv. & Indem. Co.*, No. 18-710-WBV-JCW, 2020 WL 1969984, at *5-6 (E.D. La. Apr. 23, 2020) (rejecting similar argument under *Vega*).

**B.     The Recommendation Correctly Finds That Aetna Is Entitled To Summary Judgment On Victory's ERISA Claims.**

Next, the Recommendation correctly finds that Aetna is entitled to summary judgment on Victory's ERISA claims because Victory failed to provide the Court with sufficient evidence to raise a genuine issue of material fact on whether Aetna correctly interpreted the ERISA plans. The Magistrate Judge clarified that Aetna is entitled to summary judgment regardless of whether abuse-of-discretion or *de novo* review applies. Victory nevertheless objects to the Recommendation because it did not conclude that *de novo* was the appropriate standard of review and because it did conclude that Aetna should be granted summary judgment under either standard. Both objections are without merit.

**1.     Victory is not entitled to a *de novo* review as it alleges.**

While Victory argues that it is entitled to a *de novo* review under ERISA, the abuse-of-discretion standard applies. Importantly, the Recommendation finds that the health plans at issue delegated to Aetna the discretionary authority to determine eligibility for benefits and construe plan terms, and Victory does not dispute this finding. Rather, Victory argues that Texas Insurance Code § 1701.062(a) prohibits "insurers" from using delegation-of-discretionary-authority clauses in insurance policies delivered in the State of Texas. As the Recommendation indicates, however, Victory failed to meet its burden to show that Section 1701.062(a)—which applies only to an "insurance" contract or policy delivered within the State of Texas —actually applies here. *See Hunter v. Baylor Health Care Sys.*, No. 3:18-CV-0881-N, 2019 WL 3818838, at *2 (N.D. Tex. Aug. 14, 2019) (finding that the plaintiff had the burden of establishing that § 1701.062(a) applies to the plan). Indeed, it does not.

14

First, the health plans in this case are *self-funded*, i.e., funded by employer and/or employee contributions.[44] Aetna provided only third-party claims administrative services to the plans and does not "insure" any benefits. As such, these plans are not "insurance" policies within the meaning of Section 1701.062(a). *See TDI v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 854-55 (Tex. 2012) ("Although an employee health-benefit plan may in some respects act like an insurer . . . , the Insurance Code does not regulate it as one . . . .").

Second, and alternatively, as the Recommendation indicates would "most likely" be the case, ERISA certainly *does* preempt such state insurance regulations as they apply to *self-funded* plans. *See Hernandez v. Life Ins. Co. of N. Am.,* No. SA-19-CV-00022-FB, 2020 WL 1557802, at *6 (W.D. Tex. Apr. 1, 2020), *adopted by* 2020 WL 3579821 (W.D. Tex. Apr. 21, 2020) (ERISA  preempts Section 1701.062(a) for a self-funded plan); *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 61 (1990) (holding that ERISA's "deemer clause" exempts self-funded plans from state laws that may be "saved" from preemption as laws regulating insurance); *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1136 (9th Cir. 2017) (noting that ERISA's preemption of California's anti-discretionary authority statute on self-funded plans "is so clear" that the plaintiff did not even dispute ERISA preemption).[45]

---

[44] Aetna proved up the ERISA plans in Sowards' report, which are all self-funded. Victory produced no "insured" plans in response to Aetna's Motion. Nor could it. When Victory removed all the claims priced based on a Medicare-based fee schedule, it removed all the insured claims.

[45] Even though the Ninth Circuit found that the California anti-discretionary authority statute facially applied to a self-funded plan (before finding it was preempted), both the Texas Supreme Court and Fifth Circuit have held that *Texas* Insurance Code provisions regulating "health insurance policies" do not apply to self-funded plans administered under third-party administrative services contracts. *See TDI v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 854-55 (Tex. 2012) (agreeing with the Texas Department of Insurance that self-funded plans are not regulated by the Code);

While Victory argues that, in *Curtis v. Metro. Life Ins. Co.*, the Northern District of Texas found that Section 1701.062 is not preempted by ERISA, that case addressed preemption of the statute's application to an ***insurance policy***—specifically, whether it was saved from preemption as a law regulating insurance. The court even noted that the plan at issue was ***not*** self-funded. No. 3:15-CV-2328-B, 2016 WL 2346739, at *6-7 (N.D. Tex. May 4, 2016). Likewise, the Circuit Court cases that Victory cites in footnote 35 are inapposite for the same reason.[46] Thus, Section 1701.062 does not bar discretionary review, and the abuse-of-discretion standard is the appropriate standard to apply here.

### 2. Victory has not shown a genuine issue of material fact on whether Aetna failed to correctly interpret its plans.

Regarding the merits, Victory also alleges that there is a fact issue on whether Aetna failed to correctly interpret its plan terms under either standard of review. Victory relies, however, solely on ***conclusory*** expert testimony of alleged underpayments (which should be excluded in any event) and ***mischaracterizations*** of fact-witness testimony to argue that Aetna inappropriately applied internal policies in violation of plan terms. As the Recommendation observes, Victory failed to demonstrate—for even one exemplar claim— how Victory was entitled to any additional payments ***under the actual terms of any plans***. Victory thus failed to meet its burden under well-established summary judgment principles.

---

*Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 250 (5th Cir. 2016) (holding that Texas Insurance Code prompt-pay provisions did not apply to self-funded plans).

[46] While Aetna contends that ERISA preempts Section 1701.062 even for insured plans under ERISA jurisprudence, Victory has failed to raise a fact issue on whether any plans were insured.

a.    **The plans expressly incorporate "reimbursement policies."**

Clearly, Victory refused to provide any examples of any plan terms in its summary judgment response because the plan language belies Victory's own arguments. Indeed, contrary to Victory's assertions, ***the plans expressly incorporate Aetna's reimbursement policies and methodologies***. For example, one of the so-called "R&C" plans states, under the definition of **Reasonable (Recognized) Charge**:

The reasonable (recognized) charge is the lower of:

- The provider's usual charge to provide that service or supply; or
- ***The charge Aetna determines to be appropriate, based on factors such as:***
  - ***The cost of supplying the same or similar service or supply; and***
  - ***The way charges for the service or supply are made, billed or coded***.

\* \* \*

Aetna's ***reimbursement policies*** are based on:

- Aetna's review of policies developed for Medicare;
- Generally accepted standards of medical and dental practice; and
- The views of physicians . . . practicing in the relevant clinical areas.

Aetna uses [] commercial software . . . to administer some of these policies.[47]

Similarly, for the small portion of plans that Sowards identified as using the term "Fair Health" (for professional, and not facility, charges) a representative plan states:

Aetna may also reduce the recognized charge by ***applying Aetna Reimbursement Policies***. . . [48]

---

[47]    Aetna's MSJ App., DKT# 95, Ex. 6-1, at pp. A000089-90 (emphasis added).

[48]    Aetna's MSJ App., DKT# 95, Ex. 7-1, at pp. A0086788-89 (emphasis added).

Victory therefore completely ignores applicable plan terms that would "reduce" the "recognized" or "reasonable" charges, including Aetna's reimbursement policies.

### b.   Victory mischaracterizes witness testimony.

Next, in a disingenuous attempt to argue that Aetna did not "use plan terms" to process its claims, Victory suggests that Aetna's witnesses testified that Aetna applied Facility Charge Review and Ad Hoc policies to its claims, regardless of what the plans provided for pricing, such as Fair Health data. That is simply not true.

Aetna's witnesses did *not* testify that Fair Health pricing applied to *facility claims*, as Victory suggests.[49] Rather, Aetna's witnesses explained that Aetna used various out-of-network facility pricing methodologies "as applicable to the plan," which are generally explained in Aetna's motion for summary judgment. *See* DKT# 94, at pp. 8-10. These methodologies included, but were not limited to, Facility Charge Review policies and Ad Hoc *negotiations* with the billing provider to try to reach agreed terms of payment. Nor is it correct to say that Aetna's policies simply "specif[ied] payment based on a percentage of Medicare and Aetna's own internal data evaluation." *See* DKT# 164, at pp. 14-15. None of these claims was paid based on a percentage of what Medicare pays.[50] And depending on the plan and type of service, Aetna used data from third-party vendors (such as MedStat) and the facilities' *own* cost-to-charge ratio information reported to Medicare.

---

[49]   The Aetna witness (Billie Shuler) supposedly quoted in footnotes 41 and 44 of Victory's Objection handled only the areas of Facility Charge Review and Ad Hoc negotiations and was presented to explain the details of those pricing methodologies. Per the portions of the deposition cited by Victory, she did ***not*** agree that any plans "called for" FAIR Health" data.

[50]   *See* testimony cited by Victory in footnote 42 of Objection. DKT# 164, at p. 15 n.42.

Incredibly, Victory alleges that one Aetna witness, Jay Tidwell, testified that Aetna does not consider the terms of the benefit plans at all when it decides how to pay an out-of-network hospital—a clear mischaracterization of the cited testimony. DKT# 164, at pp. 15-16, n.45 & pp. 16-17. The testimony concerns what claim processors use to process claims in real time, specifically, Aetna's Web Coverage Card Inquiry (or Web CCI), which reflects benefit and coverage details of the plans within Aetna's claim system.[51] In other words, the Web CCI reflects plan terms, and Mr. Tidwell explained only that he does not personally know how the plans themselves are specifically "worded." DKT# 112-3, Ex. G at 46:5-18.

As the Recommendation duly notes, the record "suggest[s] that Victory is significantly overstating these witnesses' testimony." DKT# 160, at p. 22. Indeed, the Recommendation correctly concludes that although the testimony of Aetna's witnesses reflects that benefits determinations are "complicated," it does not generate a material issue of fact. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (stating that unsubstantiated assertions are not competent summary judgment evidence).

### c.   Victory fails to show any instance of plan terms allegedly violated.

Importantly, the Recommendation finds that Victory failed to provide even one specific instance where Aetna incorrectly interpreted plan language. Rather, Victory offers only conclusory allegations of underpayments because Aetna allegedly ignored plan terms, which is not competent summary judgment evidence. *See id.* at 1537 ("[A]lthough [the non-movant] submitted two volumes of evidentiary material, they did not identify the

---

[51]   Aetna's MSJ App., DKT# 95, Ex. 12, at ¶ 3 (explaining the function of Web CCIs).

specific portions of such evidence (if any) that supported their . . . claim."). Victory complains that the Recommendation ignores the language of the plans, but Victory does not quote a single plan in its Objection. *See Franco v. Conn. Gen. Life Ins. Co.*, No. 07-6039 (SRC), 2014 WL 2861428, at *16 (D.N.J. June 24, 2014) (finding that plaintiffs failed to meet their summary judgment burden where the record lacked proof that plaintiffs were entitled to additional plan benefits even if there were evidence of a "flawed [R&C] database"), *aff'd on summary judgment grounds*, 647 F. App'x 76 (3d Cir. May 2, 2016). Thus, Victory has not shown that it is entitled to any additional benefits under the terms of the plans.

**3.     In any event, Aetna did not abuse its discretion—the proper inquiry.**

In any event, Victory fails to show that a factfinder could determine that Aetna abused its discretion. More specifically, in arguing that Aetna abused its discretion, Victory relies on the second-prong of the *Wildbur* test, which examines: (1) the internal consistency of the plan under Aetna's interpretation; (2) relevant regulations; and (3) the factual background of the determination or any inferences of bad faith. DKT# 164, at p. 20. Victory alleges in conclusory fashion that "Aetna did not consider the FAIR Health data" and used its own internal Facility Charge Review and Ad Hoc policies to adjudicate Victory's claims." DKT# 164, at p. 18. But Victory has not considered—much less provided summary judgment evidence of—how Aetna actually processed any particular claims.

Furthermore, Victory's arguments are premised on the incorrect assertion that Aetna applied internal policies that were not included within the plans themselves. But, as shown above, these various methodologies were included within the definitions of the "Recognized Charges" that were payable for covered services, and, furthermore, the plans

do reference various "reimbursement" policies. Victory fails to show—again for even one exemplar claim—how Aetna failed to give internal consistency to the plans or violate regulations by failing to use FAIR Health data or in applying the Facility Charge Review policy. *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 628 (2d Cir. 2008).

With respect to the third factor, Victory complains that the Recommendation makes no mention of an alleged "conflict of interest." That is because those allegations were wholly unsupported by the summary judgment record. First, Victory argues that Aetna had a conflict of interest insofar as Aetna was allegedly "compensate[d] based on percentage of the amount it 'saves' plans." ***There is no evidence in the record to support this allegation whatsoever***.[52] Victory also asserts that Aetna's Special Investigation Unit (SIU) investigators (who reviewed certain claims at issue for overbilling) were "reviewed [by Aetna] based on the dollars that SIU recovers or "saves" Aetna. Aetna's corporate representative testified as to ***the opposite***:

> **Q. How -- are the investigators in the SIU evaluated in any part by the cost savings that they discover?**
> A. Not the cost savings, no.
>
> ***
>
> **Q. And are investigators incentivized to recover more dollars?**
> A. No.
> **Q. Does the amount of money that they recover impact their evaluation at Aetna?**
> A. No.[53]

The Recommendation therefore does not fail to mention any competent summary

---

[52]   The deposition testimony that Victory cites in footnote 71 (DKT# 164, at p. 21) to allegedly support its allegations that Aetna reported "administrative savings to its plan customers" did not address any compensation to Aetna at all. In fact, it is clear that the witness did not know what was even meant by "administrative savings" in the cross-examination. DKT# 112, Ex. G at 175:17-20 ("Honestly, [] I don't know for sure what that means.").

[53]   DKT# 112, Ex. I at 29:16-19 & 30:13-18.

21

judgment evidence that would support Victory's claims. In short, Victory has not shown that a factfinder could reasonably conclude that Aetna abused its discretion.

**C.     The Magistrate Judge correctly found that Aetna is entitled to summary judgment on Victory's breach of contract claims.**

Finally, Victory alleges that the Recommendation "incorrectly grants Aetna summary judgment on Victory's breach of contract claims for [non-ERISA plans] on the basis that no reasonable factfinder could find the existence of a contract." DKT# 164, at p. 22. Actually, the Recommendation finds that Victory failed to provide "the Court with any plan language for plans not governed by ERISA, through representative sampling or otherwise" in response to Aetna's motion. DKT# 160, p. 24. It was ***Victory's burden*** to demonstrate the existence of plans that Aetna allegedly breached. *See, e.g., Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (stating that the non-movant's summary judgment burden cannot be satisfied by "some metaphysical doubt as to the material facts") (citation omitted). Additionally, and alternatively, the Recommendation also finds that Victory did not urge any additional arguments as to the alleged violations of plan terms, other than those urged under ERISA plans, which fail as a matter of law. Thus, the Recommendation correctly recommends granting summary judgment on Victory's state-law breach of contract claims as well.

## III. CONCLUSION

For these reasons, the Court should adopt the Report and Recommendations of the United States Magistrate Judge, grant summary judgment in favor of Aetna and enter a take-nothing judgment on all of Victory's claims.

OF COUNSEL:                              Respectfully submitted,

HUNTON ANDREWS KURTH LLP

    and                             By:   /s/*John B. Shely*           

M. KATHERINE STRAHAN                     JOHN B. SHELY

State Bar No. 24013584                   State Bar No. 18215300

*kstrahan@huntonak.com*                  HUNTON ANDREWS KURTH LLP

ALLISON A. SJOBERG                       600 Travis, Suite 4200

State Bar No. 24089622                   Houston, Texas 77002

*asjoberg@huntonak.com*                  Telephone: (713) 220-4105

                                                Telecopier: (713) 220-4285

                                                *jshely@huntonak.com*

                                                ATTORNEY-IN-CHARGE FOR
DEFENDANTS AETNA HEALTH INC.,
AETNA HEALTH INSURANCE
COMPANY AND AETNA LIFE
INSURANCE COMPANY

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2020, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, Western District of Texas, using the CM/ECF system. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who are known "Filing Users:"

Jennifer Rudenick Ecklund
*jecklund@thompsoncoburn.com*

Andrew Cookingham
*Andrew.Cookingham@tklaw.com*

Reed C. Randel
*Reed.Randel@tklaw.com*

/s/*John B. Shely*
John B. Shely