IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NEIL GILMOUR, III, TRUSTEE FOR THE GRANTOR TRUSTS OF VICTORY PARENT COMPANY, LLC, VICTORY MEDICAL CENTER CRAIG RANCH, LP, VICTORY MEDICAL CENTER LANDMARK, LP, VICTORY MEDICAL CENTER MID-CITIES, LP, VICTORY MEDICAL CENTER PLANO, LP, VICTORY MEDICAL CENTER SOUTHCROSS, LP, VICTORY SURGICAL HOSPITAL EAST HOUSTON, LP, AND VICTORY MEDICAL CENTER BEAUMONT, LP, | § § § § § § § § § § § § | |
| *Plaintiffs*, | § § § | JURY DEMANDED |
| VS. | § § | CIVIL ACTION NO. 5:17-cv-00510-FB |
| AETNA HEALTH, INC., AETNA HEALTH INSURANCE COMPANY, AND AETNA LIFE INSURANCE COMPANY, | § § § § § | |
| *Defendants*. | § § | |

**REPLY IN SUPPORT OF VICTORY'S OBJECTIONS TO
REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE[1]**

---

[1] Neil Gilmour, III, solely in his capacity as Trustee for the Grantor Trusts of Victory Parent Company, LLC; Victory Medical Center Craig Ranch, LP; Victory Medical Center Landmark, LP; Victory Medical Center Mid-Cities, LP; Victory Medical Center Plano, LP; Victory Medical Center Southcross, LP; and Victory Medical Center Beaumont, LP; Victory Surgical Hospital East Houston, LP (collectively, "Victory" or the "Trustee") files this Reply in Support of Victory's Objections to Report and Recommendation of United States Magistrate Judge ("Objections"). Dkt. No. 164. As used herein, "Response" refers to Defendants' Response to Plaintiffs' Objections to Report and Recommendation of United States Magistrate Judge [Dkt. No. 169, filed Aug. 11, 2020], "Recommendation" refers to Report and Recommendation of United States Magistrate Judge [Dkt. No. 160, entered June 12, 2020]," Aetna's Motion for Summary Judgment" refers to Aetna's Motion for Summary Judgment [Dkt. No. 94, filed Oct. 29, 2019], "Victory's Summary Judgment Response" refers to Victory's Response to Aetna's Motion for Summary Judgment [Dkt. No. 110, filed Nov. 22, 2019], "Aetna's Sowards Motion" refers to Aetna's Opposed Motion to Exclude the Opinions of Plaintiff's Damages Expert, Rodney Sowards [Dkt. No. 103, filed Nov. 15, 2019], and "Victory's Sowards Response" refers to Trustee's Response to Defendants' Opposed Motion to Exclude the Opinions of Trustee's Damages Expert, Rodney Sowards [Dkt. No. 131, filed Dec. 6, 2019].

Faced with the reality that it failed to reimburse Victory in accordance with its members' health benefit plans, Aetna resorts to baseless allegations that Victory misrepresents witness testimony and unfounded claims of fraud to distract the Court from the truth: Aetna is not entitled to summary judgment on Victory's ERISA § 502(a)(1)(B) and breach of contract claims. Aetna also takes a kitchen-sink approach and throws out every possible criticism of Sowards' analysis without understanding the reasonableness of his methodologies.   When properly ignoring such distractions, Victory's Objections establish that (1) Sowards' methodology is the only evidence before the Court of how Aetna should have paid Victory when the plans required the use of FAIR Health data; (2) Sowards' Usual and Customary methodology is well-accepted and reliable; and (3) Sowards' opinions establish Aetna's liability for failing to pay Victory as its members' health plans required.   For these reasons and those described in Victory's Objections, the Court should deny Aetna's Motion for Summary Judgment and the Sowards Motion.

A.      **Aetna failed to pay for Victory's services as its members' health benefit plans require.**

One of the health plans at issue in this case requires Aetna to pay an out-of-network provider subject to "Reasonable and Customary Limits: Allowable amounts for services are determined by reasonable and customary (R&C) limits.  ***Aetna uses the industry-wide standard for R&C limits obtained from FAIR Health***."[2]  Another of the plans states that Aetna will pay an out-of-network provider "[t]he charge Aetna determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made, billed or coded or: . . . For facility charges: ***Aetna uses the charge Aetna determines to be the usual charge made for it in the geographic area***

---

[2] Exhibit 1 - A0057594 at A0057640 (emphasis added).  Aetna included a portion of Exhibit 1 as Exhibit 9-1 of its Motion for Summary Judgment, but excluded the applicable definition cited above.

*where it is furnished*."[3]  These plans are representative of the plans that Sowards categorized as FAIR Health and Usual and Customary, respectively.

Aetna ignored these requirements when it adjudicated Victory's claims, and now argues to this Court that, despite clear language like that in the representative plans quoted above, it may reimburse an out-of-network provider like Victory ***any way that it wants***.[4]  Aetna goes so far as to suggest that, even if a plan expressly requires it to use of FAIR Health data to determine the allowable amount, it can ignore this language by vague reference to Aetna's reimbursement policies.[5]  For support, Aetna highlights language in one of its plans that states, in addition to a requirement that Aetna pay a reasonable charge, that Aetna can pay any amount that "Aetna determines to be appropriate."[6]  Aetna's argument contorts the plan language that it is charged with administering in ways that render it unrecognizable.  In short, if Aetna can simply pay what it wants, there is no need for a written benefit plan.

To distract the Court, Aetna accuses Victory of misrepresenting Aetna's witness testimony in its Objections.  As an example, Aetna included a block quote of an Aetna witness's testimony to suggest that the witness did not testify that Aetna's SIU team is reviewed based on the amount that it recovers or saves.  Though the witness quibbled that Aetna does not review "cost savings," Aetna omitted the portion of testimony in which the witness expressly stated that in reviewing its SIU investigators: "[w]e do ***look at dollars recovered*** during what we call the performance period."[7]  The Court should ignore such distractions, including Aetna's unfounded

---

[3] Exhibit 2 - A0038192 at A0038280.
[4] Response, pp. 17-18.
[5] Response, p. 17, citing Aetna MSJ App., Dkt. #95, Ex. 7-1, at pp. A0086788-89.
[6] Response, p. 17, citing Aetna's MSJ App., Dkt. #95, Ex. 6-1, at pp. A000089-90.
[7] Kiefer Deposition at 29:20-30:1. [Response APP. 0332-333] (emphasis added).

**REPLY IN SUPPORT OF VICTORY'S OBJECTIONS TO**
**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE—PAGE 2**

accusation that Victory's claims are somehow marred in fraud.[8]  Despite Aetna's hope, it is not immune from ERISA's requirements.

It is bedrock ERISA caselaw that "[t]he plan, in short, is at the center of ERISA."[9]  When considering whether Aetna misapplied the terms of its plans, ERISA requires the Court to determine whether Aetna's interpretation of the plan is consistent with a fair reading of the plan.[10]  This requires that "[t]he provisions are to be read according to their plain meaning and as they are likely to be 'understood by the *average plan participant*.'"[11]  Aetna's argument flies in the face of these principles; indeed, no reasonable plan participant would expect Aetna to ignore the plain terms of their plan when determining the out-of-network reimbursement.  For example, for the two representative plan provisions quoted above, a reasonable plan member would understand that Aetna would reimburse an out-of-network provider based on FAIR Health or the usual rate in the patient's geographic area, respectively.  No reasonable plan participant would expect Aetna to apply its reimbursement policies in a way that contradicts those terms.

As established in Victory's Objections, Sowards Response, and Summary Judgment Response, there is a question of fact as to whether Aetna paid Victory as its plans require.  Aetna attacks Victory's summary judgment evidence and argues that Victory has failed to meet its burden because it did not establish that Aetna did not follow its internal reimbursement policies.  Aetna's argument misses the point: Victory is not required to create an issue of fact as to whether Aetna reimbursed Victory using one of Aetna's internal policies.[12]  Instead, the issue is whether Aetna reimbursed Victory in accordance with Aetna's members' *health benefit plans*. Because

---

[8] Aetna knows this is hotly contested, and did not move for summary judgment on this claim.
[9] *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013).
[10] *Koehler v. Aetna*, 683 F.3d 182, 187 (5th Cir. 2012).
[11] *Dialysis Newco, Inc. v. Community Health System Group Health Plan*, 938 F.3d 246, 251 (5th Cir. 2019) (quoting *Walker v. Wal-Mart Stores, Inc.*, 159 F.3d 938, 940 (5th Cir. 1998) (quoting 29 U.S.C. § 1022(a)(1))) (emphasis added).
[12] Moreover, Aetna cites two plans that it contends incorporate these policies into their plans.  However, there are more than 1,700 claims in dispute, and it is Aetna's burden to negate any issue of material fact.

Victory has, at a minimum, established a genuine issue of material fact, Aetna is not entitled to summary judgment on Victory's ERISA § 502(a)(1)(B) and breach of contract claims.

**B.   Sowards' FAIR Health Methodology is reliable and should not be excluded.**

**1.   Sowards correctly identified claims that Aetna had to pay using FAIR Health.**

Aetna's Response includes many excuses for why it was not required pay any of the medical claims at issue in accordance with data obtained from FAIR Health, and even repeatedly criticizes Sowards' use of FAIR Health data in determining the amount that Aetna should have reimbursed Victory under the applicable health plans.  This is despite the fact that the health plans at issue *explicitly reference FAIR Health* and payment in accordance with FAIR Health data.  The language in the representative plan quoted above could not be clearer.  Another exemplar from Sowards' report defined the "Recognized Charge" to be 80% of the Prevailing Rate, which the plan defines as the "*rates reported by FAIR Health*, a nonprofit company, in their database."[13]

One of these excuses bears special mention here: Aetna's contention that FAIR Health does not provide data to pay facility claims.[14]  This is demonstrably incorrect; indeed, the Texas Department of Insurance has referred to the FAIR Health database as a common reimbursement methodology, and reported that most insurers (especially larger insurers like Aetna) utilize FAIR Health data to determine the usual and customary rate when paying out-of-network providers for emergency claims.[15]  Moreover, as noted in Victory's Sowards' Response, Sowards actually called FAIR Health to verify that he was using the correct data to price the Victory FAIR Health claims.

---

[13] Sowards Report, p. 7 [Dkt. No. 112-3].
[14] Response, pp. 9-10.
[15] *See* Tex. Dep't of Ins., Usual and Customary Survey (Jan. 2017), at 11, 13-15. Available at https://www.tdi.texas.gov/reports/life/documents/ucreport.pdf.   Indeed, the Texas Department of Insurance has selected FAIR Health to provide benchmark data for its surprise-billing dispute resolution process. https://www.tdi.texas.gov/news/2019/tdi11262019.html

Aetna's confusion regarding the FAIR Health data underlies its request that the Court ignore any plan's references to FAIR Health, no matter the clarity.  Notably missing from Aetna's arguments, however, is ***any contention whatsoever*** that it ever consulted FAIR Health data when paying a single claim at issue.  Because Aetna failed to pay these claims in accordance with FAIR Health as a plain reading of the plans required, Victory has—at a minimum—established a genuine issue of fact with respect to these claims, and the Court should reject the Recommendation's conclusion that Aetna is entitled to summary judgment on these claims.[16]

> **2.    The Recommendation ignored Sowards' FAIR Health opinions, and he did not use his Usual and Customary methodology for the majority of the FAIR Health claims.**

As explained in Victory's Objections, the Recommendation fails to adequately address or consider the substance of Sowards' FAIR Health methodology.[17]  Indeed, Sowards' opinions are the only evidence whatsoever of how these claims should have been paid based on data actually provided by FAIR Health.  In response, Aetna argues that the Recommendation actually did address Sowards' FAIR Health opinions because Sowards' Usual and Customary opinions were applied wholesale to a majority of these claims.  Not so.

Contrary to Aetna's assertions, the Recommendation undertook no effort whatsoever to assess the appropriateness of Sowards' FAIR Health methodology.  Aetna tries to justify this absence by suggesting that the Recommendation did not need to address Sowards' FAIR Health methodology because approximately 88% of the FAIR Health claims at issue in his analysis were merely priced using Sowards' Usual and Customary methodology.  However, as evidenced by Aetna's Response, Aetna misunderstands Sowards' methodology.  Despite Aetna's suggestion, Sowards did not simply ignore FAIR Health data in its entirety for 88% of the FAIR Health

---

[16] *See Koehler*, 683 F.3d at 187.
[17] Objections, pp. 5-8.

claims and fall back on his Usual and Customary methodology.  Instead, Sowards looked at each FAIR Health claim and considered the available data for each specific code associated with that claim.  When available, he relied on FAIR Health data in its entirety.  To the extent that FAIR Health data wasn't available for a specific line item associated with a claim, Sowards reverted to the only data available to him—Aetna's historical payments.  In the rebuttal report cited in Aetna's Response, Aetna's own expert establishes that this calculation attributed to a smaller portion of Sowards' opinions than Aetna's Response suggests.  Indeed, Aetna's expert concluded that 32% of the damages associated with Sowards' FAIR Health opinions incorporated his historic benchmark data when FAIR Health data was not available.[18]  Therefore, though 88% of the claims may have incorporated some of Sowards' Usual and Customary data, actual FAIR Health data was relied upon far more than Aetna's Response would suggest.

Furthermore, Sowards' use of this historical information when FAIR Health data was not available was supported by the plans themselves.  Sowards indicated in his initial report the reasonable basis for this practice—nearly *all* the plans reviewed had usual and customary fee payment language, and the FAIR Health plans were the ones that further specified that FAIR Health schedules should be used in making this determination.[19]  Consequently, when no FAIR Health rate was available, Sowards defaulted to his "usual and customary" calculation because that is what the plain text of the plans indicated should happen. This practice does not support excluding Sowards' opinion, but instead supports its admission.

3.      **Sowards did not impermissibly interpret plan terms.**

Aetna argues that Sowards' FAIR Health opinions are improper because Sowards is

---

[18] Dkt. No. 103-4, p. 37.
[19] *See* Sowards Report, Ex. A, p. 6 n. 12 ("While almost every Plan identified an out-of-network reimbursement methodology based on the R&C charge, certain Plans included additional clarifications within the definition of R&C charge which specified the use of the CMS Allowable or FAIR Health information.") [Dkt. No. 112-3].

offering legal opinions by "interpreting" the FAIR Health plans. Aetna criticizes Sowards because he admittedly had to read the health plans to correctly categorize them.  Aetna fails to explain how Sowards could have known which claims should have been paid using FAIR Health without reading the plans.[20]

More to the point, and as Aetna itself admits, the stricture against expert legal opinions on contracts is limited to preventing testimony to a jury on the subject of contract interpretation.[21] Nothing in the law or the rules of evidence prevents an expert from drawing conclusions from a contract's text to reach other expert conclusions when those secondary conclusions are the subject of the expert's testimony.[22]  Put another way, experts are not forbidden from reading contracts, or even drawing conclusions from them; experts are only forbidden from instructing a jury about the meaning of contracts where that is a matter in dispute, or where the jury can see that meaning for themselves.[23]  Aetna's argument would preclude an expert from ever considering the contract he or she is opining on: an illogical result.

Sowards will not testify on what specific plan provisions mean to the extent their meanings are disputed between the parties. The substance of his testimony *is not* that the jury should read any particular plan terms the way Victory reads them, but that if the plans *are read* the way Victory reads them, then Aetna systematically undercompensated Victory, resulting in damages in the amounts that Sowards calculated.

### 4.    Aetna's arguments regarding Sowards' alleged failure to consider additional factors goes to the weight—not the admissibility—of those opinions.

---

[20] See *Dennington v. St. Farm Fire & Cas. Co.*, 4:14-CV-04001, 2016 WL 11596075, at *2 (W.D. Ark. Aug. 24, 2016) ("[T]he Court *finds it necessary for the experts to examine the contracts before making an opinion*." (emphasis added)).
[21] *See Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. C-09-312, 2010 WL 4595592, at *4 (S.D. Tex. Nov. 1, 2010) (citations omitted).
[22] *Dennington*, 2016 WL 11596075, at *2.
[23] *See United States ex rel. Jordan v. Northrop Grumman Corp.*, CV 95-2985 ABC (EX), 2003 WL 27366248, at *3 (C.D. Cal. Feb. 24, 2003).

Aetna refers to a "number of other facts and circumstances" that should have been considered, such as that "many of the plan sponsors" have elected to use the Facility Charge Review mechanism to determine facility charges (as opposed to data from FAIR Health).[24]  First, whether a plan sponsor has opted into Facility Charge Review is not reflected in the benefit plans—the plan's use of FAIR Health is.  Thus, what Aetna criticizes is not a mistake at all: it is Sowards applying the plans as written, and as a reasonable beneficiary would have understood them.

Moreover, Aetna fails to quantify these alleged problems or show how they substantially impair the validity of Sowards' approach as applied to 400 claims. Aetna refers only to individual examples given in deposition or handfuls referred to elsewhere, not to broad sets of plans that would render Sowards' whole methodology suspect. Individual mistakes or ignorance of specific relevant facts generally goes to the weight of an expert's testimony, not to its admissibility.[25]  Aetna's complaints about what Sowards considered in his analysis does not affect that fact that the ***methodology*** that he employed, relying on FAIR Health data, was reliable and admissible.  Though Aetna is free to cross-examine Sowards regarding what he did or did not consider, it has failed to establish that his FAIR Health opinions are unreliable.

### C.    Sowards' Usual and Customary Methodology is reliable and admissible.

Aetna refuses to accept and continues to ignore that Sowards used historic reimbursement rates that ***both Victory and Aetna*** found to be acceptable in calculating his Usual and Customary reimbursement methodology.  Contrary to Aetna's suggestion, Sowards did not base his Usual

---

[24] Aetna also fails to mention that election of Facility Charge Review is not contained anywhere in the patients' health plans, and is therefore irrelevant to how Aetna was obliged to pay Victory's claims. *See US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100-101 (2013) (holding that ERISA focuses on the language of the plan—not an insurer's policies).

[25] *See Villegas v. Cequent Performance Products, Inc.*, SA-15-CV-473-XR, 2017 WL 816872, at *10 (W.D. Tex. Mar. 1, 2017).

and Customary methodology on "'what the provider unilaterally says its services are worth'" which is represented by the full billed charges.[26]  If that were the case, then Sowards' opinion would have been that the Usual and Customary rate for Victory's services is 100% of the billed charges—not 64%.  And he did not base this figure solely on Victory's say so.  Sowards based his benchmark rate on Aetna's own payment history, the best historic evidence of what Aetna historically had said Victory's services were worth.  And as Aetna must recognize, this is a well-accepted methodology for determining the market value of Victory's services.[27]

Furthermore, Sowards' benchmark rate was created based on a very large sample of claims that are undisputed between the parties and cover all sorts of services, plan types, and claim types.  Therefore, contrary to Aetna's assertions, the benchmark rate operates to smooth out any deviations among individual plans and claims to come to a reasonable market rate, generating a statistically valid rate for the whole.

Finally, Aetna argues that Sowards' Usual and Customary opinions should be excluded as a whole based on an alleged failure to consider additional information in certain plans and based on its argument that Victory somehow "cherry picked" the claims that Sowards' considered in arriving at his benchmark.  But "questions relating to the bases and sources of a witness's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[28]  Aetna's argument that the information Sowards used was an insufficient basis for his opinion thus goes to the weight of his testimony, not its admissibility. That alone justifies denial of Aetna's Sowards Motion.  And contrary to Aetna's assertions that Sowards failed to consult actual plan language, Victory's Objections confirm that

---

[26] Response, p. 6 (quoting *Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1275 (2014)).
[27] *See Children's Hosp.*, 226 Cal. App. 4th at 1275-76.
[28] *Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, CV H-15-1307, 2017 WL 3142444, at *3 (S.D. Tex. July 25, 2017).

Sowards consulted every plan at issue in this case in determining the proper methodology to apply in forming his opinions.

**D.**      **Sowards' opinions establish Aetna's liability as well as Victory's damages.**

Liability in this case is determined by answering one question: Did Aetna pay Victory less for the services it provided Aetna's members than those members' health plans required. If it did, then Aetna is liable. Victory's damages are established by taking the difference between what Aetna paid and what it should have paid.

Aetna argues that there is a distinct difference between the question of whether the plans' terms were misapplied and how to calculate damages.[29] The truth, however, is that the only way to determine if Aetna misapplied the plans' terms is to determine if there were damages. The application of the plans' terms in this case can only be assessed based on how Aetna reimbursed Victory for its claims, by determining whether there are any damages. To argue otherwise would require Victory to employ two different experts to perform the exact same function, with one wearing the "liability" hat and the other wearing the "damages" hat. That would be an absurd requirement. Because Sowards' testimony should be considered in evaluating Aetna's Motion for Summary Judgment and Sowards' opinions are reliable and admissible, the Court should deny the Sowards Motion and Aetna's Motion for Summary Judgment.

**E.**      **Conclusion and Prayer.**

For these reasons, Victory respectfully requests that the Court modify the Report and Recommendation and enter an order that denies (1) Aetna's Opposed Motion to Exclude the Opinions of Plaintiff's Damages Expert, Rodney Sowards; and (2) denies Aetna's Motion for Summary Judgment with respect to Victory's ERISA § 502(a)(1)(B) claims and Victory's breach of contract claims. Victory requests all other relief to which it has shown itself entitled.

---

[29] Response, p. 12.

Dated: August 24, 2020

Respectfully submitted,

By: ___*/s/ Andrew Cookingham*___
    Andrew Cookingham
    State Bar No. 24065077
    Andrew.Cookingham@tklaw.com

    Reed C. Randel
    State Bar No. 24075780
    Reed.Randel@tklaw.com

THOMPSON & KNIGHT LLP

One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
FAX (214) 969-1751

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2020, I electronically filed the foregoing document upon counsel of record, using the CM/ECF system.

/s/ *Reed C. Randel*_____
    Reed C. Randel